No. 45,637

THE FIRST NATIONAL BANK OF MADISON, KANSAS, *Appellee*, v. R. P. HARRISON, ROBERT REGAN, HARVEY GRAVES, COURTNEY L. QUICK, D. T. NORRIS, VIRGIL RADER, HENRY C. THOMPSON, DONNELL ROBINSON, REX LIVINGSTON and ORION E. SMITH, also known as O. E. SMITH, *Appellants*; ERMA ROUSH, Administrator of the Estate of Paul Roush, Deceased, et al., Defendants.

(469 P. 2d 344)

Opinion filed May 9, 1970.

*John M. Wall*, of Sedan, and *James C. Pinkerton* of Pinkerton and Pinkerton, of Tulsa, Okla., argued the cause and were on the brief for the appellants.

*Harold G. Forbes*, of Eureka, argued the cause and *Dale L. Pohl*, of Eureka, was with him on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: This is an action to foreclose a security interest in a number of cattle in possession of a rancher at the time of his death. In trial to the court the plaintiff bank prevailed. Ten defendants who claimed ownership to about two-thirds of the cattle have appealed.

This dispute stems from the cattle operations of Paul Roush, a reputable Greenwood county rancher, who was accidentally electrocuted August 8, 1966.

During his lifetime Roush conducted four types of enterprises involving cattle: (1) He raised cattle in partnership with others; (2) he conducted large scale grazing operations in which he pastured cattle belonging to other persons on land he rented; (3) he raised cattle owned by himself individually; and (4) under contractual arrangement he bought, cared for and sold cattle belonging to others. The disputed claims in this suit arise from the last two operations. Ascertainment of the facts regarding them has been complicated because Roush's personal business records

were destroyed by fire in the same incident in which he lost his life.

Plaintiff, the First National Bank of Madison, Kansas, contends the 208 cows, together with certain calves, which were in Roush's possession at the time of his death, were cattle owned by Roush individually and therefore subject to the security agreement entered into by Roush with it; the ten defendants claimed absolute ownership of 143 of these same cattle under contractual arrangement with Roush. After the bank filed this lawsuit a receiver was appointed, the cows and calves (along with a number of steers and bulls) were sold and the sale proceeds turned in to the trial court for disposition. So far as possible each cow sold was separately identified by the receiver and a record kept of the sale price of each cow. The amount of the bank's claim exceeds the net proceeds of the sale.

The evidence at trial included the testimony of the bank's president, a rancher neighbor to Roush who was appointed receiver, and of the ten contract cattlemen as well as exhibits in the form of bank records, and contracts and checks passing between Roush and the contract cattlemen, revealing the following:

Roush, as a cattleman, had been a customer of the appellee bank for twenty years prior to his death, both as depositor and borrower. He had been indebted to the bank since some time prior to 1958. Frequently the bank would honor drafts he drew for the purchase of cattle although he had no funds on deposit to cover them. Annually his indebtedness would be consolidated and renewed in the form of a chattel mortgage. Roush's indebtedness to the bank was a continuing one. In December, 1962, he owed it $38,082.25 and as security had mortgaged 159 cows and other property. On December 30, 1963, the number of his mortgaged cows had been reduced to 144. Between that date and the time of his death the bank financed his purchase of seventy-nine cows and forty-nine calves. During this period he sold some cattle with permission of the bank. Roush purchased forty-two cows and twenty-eight calves with bank money during the six months preceding his death. The bank's security agreement sought to be foreclosed here was entered into by Roush May 23, 1966, covering 210 Hereford and Angus cows three to six years old as well as other livestock and ranching equipment. The instrument recited: "This chattel mortgage is intended to and does cover all our livestock, cattle and horses and all equip-

ment cars-trucks, etc.", and was given along with a financial state-
ment, in security of Roush's promissory note in the sum of $61,374.75.
The security instrument was duly recorded. Soon after its execution
the bank president viewed cattle in a pasture identified by Roush
as the cattle covered by the agrement.

Sometime in 1963 Roush, aided by two agents, developed a plan
to enter into contracts with persons wishing to invest money in the
cattle business. Generally, the plan provided that the investor,
called a contract cattleman, would furnish Roush money to buy a
cow and would pay Roush in advance to keep the cow for him.
When a calf was produced Roush was to receive for future care of
the cow either sixty per cent of the price of the calf at the time of
marketing or $5.00 per head per month. The contract cattleman
would own the cows and calves and share in the proceeds from calf
sales. Roush was to provide all services and do all the work in
caring for the cattle and make all decisions as to sale. Each con-
tract cattleman initially paid Roush $110.00 per cow for its purchase
plus $89.00 to maintain it for eighteen months or until its first calf
reached marketable age. Roush was to buy cows at auction for the
contract cattlemen. In January, 1963, Roush opened an account in
appellee bank styled "Roush Cattle Company", ostensibly to serve
the contract cattle program. By October, 1963, he had begun to
commingle in this account other funds representing both the
purchase and sale of cattle having no connection with the contract
program and in June, 1965, this account was closed. Meanwhile,
during 1963 and 1964 Roush entered into separate written contracts
with appellants for the handling of cattle under the program. Only
two or three of the appellants were acquainted with each other
prior to this litigation and each acted separately in dealing with
Roush. In all, appellants over a period of time contracted with
Roush for the purchase and handling of 143 cattle which, together
with whatever calves may have belonged to these cows, are the
subject of appellants' claims here. Appellants each claim ownership
of from five to forty-nine cows. Apparently other persons had also
entered Roush's contract program but in some manner had left it
prior to Roush's death.

At various times Roush purportedly sold calves belonging to
appellants and remitted their forty per cent to them. These pay-
ments were always uniform, each appellant receiving the same price
for exactly the same weight calf. Occasionally some one of the

appellants would appear at Roush's ranch and Roush would point to a cow and say, "That's one of your cattle." Roush kept his own cattle and those of the contract cattlemen in the same pastures.

Roush possessed two registered brands. The first, the 4-F brand, was registered in 1943. In October, 1963, he registered one known as the Slash Open A. The evidence was somewhat conflicting respecting the purpose and use of these brands. There was testimony the old brand tended to splotch and Roush desired one wherein the marks did not cross as in the latter. The appellants offered testimony their cattle were to bear the latter brand and an individual number as well identifying each contract cattleman. Roush used the Slash Open A brand on some cattle purchased or produced after initiation of the contract cattle program but having no connection with it. At the time of his death, twenty-four cows bore the 4-F brand, forty-five bore the Slash Open A brand with a number, sixty-six bore the Slash Open A brand without a number and the remainder bore no brand at all.

There was no evidence that anyone had paid taxes on the cattle in question. There was evidence no cattle were listed for taxation in the name of any of the appellants.

We have not attempted to set forth all the evidence before the trial court and will not detail it further except in connection with the trial court's findings.

Two trial errors urged by appellants should be mentioned first. They contend the trial court erroneously excluded two exhibits from evidence. These consisted of a letter and a brochure addressed to prospective contractors in the cattle program describing in glowing terms how the program operated and the opportunities presented from the investment and income tax standpoint.

The basis of the trial court's ruling excluding these documents from evidence apparently was that they had not been mentioned at the pretrial conference where all exhibits were expected to be produced, and no mention of them had been made either to the court or adverse counsel prior to trial. This alone could form a satisfactory basis for the ruling. Moreover, the written contracts and purchase orders entered into between Roush and appellants were in evidence and appellants testified fully as to their prior negotiations with Roush and his agents. The proffered exhibits contained little if any relevant information not made known to the trial court through other testimony and must be considered cumulative. Re-

versible error in any event could not be predicated upon the exclusion.

Appellants complain the trial court erroneously shifted the burden of proof to them to prove ownership of the cattle rather than permitting it to remain upon appellee as plaintiff in the action. Although the trial court did use some language respecting the burden to be sustained by appellants in establishing their claim to the cattle, we think that overall it left the requisite burden upon the appellee bank to sustain its claim. Appellants concede each side had to establish its claim to the cattle by evidence before it could prevail. The trial court found favorably to appellee, concluding as a fact that the bank had established a security interest in the cattle. Implicit therein is a finding of ownership in Roush.

We turn now to those findings, and reasons given therefor, which are really the target of appellants' skillfully presented position upon appeal. Their remaining specifications of error are such they must fail if the trial court's findings of fact are sufficiently supported by the evidence.

The trial court discussed the evidence at length in a comprehensive memorandum opinion. Factors taken into account in its finding that the cattle in question were subject to the security agreement included the age and productivity of the cows in relation to the date and the purpose of their purchase; indicia of title in Roush including their possession by him and use of his registered brands, such use being forbidden by law upon cattle belonging to anyone else; the continuous furnishing by the bank of money to Roush with which to buy cattle and a long continued course of dealing with the bank which did not change immediately preceding his death; Roush's representation the cattle in question were the ones covered by the security agreement; statements by him to a neighbor upon seeing a fat calf, "That is mine and [the banker's] calf." The court commented on the paucity of evidence as to Roush's actual dealings under the contract cattle program including the statement that no particular cow could be identified as having in fact been purchased for any of the appellants nor was there any showing in their behalf of the specific ownership of any cow; also no showing was made that calves had actually been sold at the times Roush made the always uniform payments to appellants for calf proceeds under their contracts.

This is essentially a fact case. The purchase and disposition of

cattle were evidentiary matters for the trial court to weigh and we must conclude its findings were sufficiently supported by evidence. Upon appellate review conflicting evidence and inferences to be drawn therefrom supporting a view contrary to that arrived at by the trial court are, of course, to be disregarded.

Appellants urge application of the equitable doctrine that where one of two innocent parties must suffer from the wrongdoing of a third person, the burden should fall upon the one whose conduct occasioned the loss. They point to evidence that two of them consulted the bank's president as to Roush's reliability as a cattleman prior to investing in the program. The banker reported he considered Roush reliable; he also told them how Roush operated and what he owed the bank but did not tell them the bank had transferred some of his indebtedness to its reserve account. The inferences to be drawn from this latter omission are conflicting. The banker explained the transfer was made for the purpose of enabling the bank to increase its reserve and did not mean the borrower was a bad risk; if the bank had a borrower who it knew was not going to pay off for three or four years it was the bank's policy to transfer part of the debt to the reserve account so it could transfer monies out of the profits to the reserve account; this was generally done for cattle customers and that such a transfer was no reflection on the borrower. Before the equitable doctrine would be applicable the disputed inferences of fact would have to be resolved favorably to appellants, which we cannot do upon appeal. Appellants in their brief frankly state they relied on the integrity and ability of Roush. The record of trial reveals no explanation for the shortage of cattle at the time of his unfortunate death, but for which these conflicting claims might all have been satisfied.

Finally, appellants urge the cows on hand at the time of Roush's death bearing the Slash Open A brand, along with a *pro rata* share of calves, be declared to be their property, but in view of the trial court's findings of fact we are aware of no legal theory under which we can so compromise and modify the judgment.

The judgment appealed from is affirmed.

APPROVED BY THE COURT.