No. 14933

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

---

MICHAEL WORKMAN AS THE PERSONAL
REPRESENTATIVE OF THE ESTATE OF
SUSAN E. WORKMAN,

Plaintiff and Appellant,

vs.

McINTYRE CONSTRUCTION COMPANY, S.
BIRCH, INC., and the STATE OF MONTANA,
and RICHARD BLIESENER,

Defendants and Respondents.

---

Appeal from:  District Court of the Fourth Judicial District,
In and for the County of Missoula
Honorable Jack L. Green, Judge presiding.

Counsel of Record:

For Appellant:

Milodragovich, Dale and Dye, Missoula, Montana
Lonnie J. Dale argued, Missoula, Montana

For Respondents:

Boone, Karlberg and Haddon, Missoula, Montana
Sam Haddon argued, Missoula, Montana
Garlington, Lohn and Robinson, Missoula, Montana
Gary Graham argued, Missoula, Montana
Carolyn Clemens argued, Missoula, Montana

Noel Larrivee, U of M  Law School, Missoula, Montana

---

Submitted: May 23, 1980

Decided: SEP 10 1980

Filed: SEP 10 1980

*Thomas J. Kearney*
Clerk

Honorable John M. McCarvel, District Judge, sitting in place of Mr. Justice Daniel J. Shea, delivered the Opinion of the Court.

Plaintiff appeals from a judgment after a jury verdict in favor of all three defendants and a denial of his motion for a new trial in the District Court of the Fourth Judicial District, in and for the County of Missoula.

The agreed facts are as follows:

Defendants, McIntyre Construction Company and S. Birch, Incorporated, as joint venturers, were under contract from the State of Montana to widen and resurface approximately ten miles of U. S. Highway 93 starting three or four miles south of Arlee, Montana. Defendants, McIntyre Construction Company and S. Birch, Incorporated, applied one lift of asphalt paving to the surface of the highway, leaving a dropoff on the west side of the highway shoulder.

On June 18, 1976, at approximately six-thirty p.m., defendant Richard Bliesener was driving south on that portion of U. S. Highway 93 that had been resurfaced by defendants McIntyre Construction Company and S. Birch, Incorporated. Plaintiff Michael Workman was operating a vehicle in which his wife, Susan Workman, and daughter, Reminisa Workman, were passengers, driving north on that portion of U. S. Highway 93 that was being resurfaced. The right wheels of defendant Richard Bliesener's motor vehicle went off the right edge of the pavement lift and, ultimately, the Bliesener vehicle and the Workman vehicle collided. Susan Workman died as a result of the injuries sustained in the collision.

The two causes of action consolidated for jury trial were by the plaintiff in his representative capacity as personal representative of the estate of Susan Workman, his deceased wife, and as next friend of Reminisa Workman, his daughter.

The transcript of the testimony and briefs of counsel confirm the following facts:

- 2 -

1. There was only one sign observable to southbound traffic located one or two miles before the accident scene which read: "Road Construction, 10 miles."

2. There was a four-inch drop off the pavement on the outside of the southbound lane.

3. Defendant Bliesener's vehicle veered sharply to the left into the path of the Workman vehicle in the northbound traffic lane when Bliesener turned left to get his right wheels back onto the pavement.

4. There were no contentions by defendants that Michael Workman was in any way negligent in operating his vehicle.

5. McIntyre Construction Company, S. Birch, Incorporated, and the State based their defense on the negligence of Bliesener as the proximate cause of the accident.

6. Bliesener based his defense on the negligence of McIntyre Construction Company, S. Birch, Incorporated, and the State as the proximate cause of the accident.

7. No speed limit signs were posted.

8. The flow of traffic through the area was moving at 55 miles per hour, the same speed as Bliesener's vehicle.

9. There were no warning signs or devices of the four-inch drop off the pavement or centerline markings channeling traffic.

10. There were no contentions that an Act of God was involved nor that any emergency existed, or that there was an involuntary violation of a statute due to circumstances beyond the control of the defendants.

The following are the issues presented for review:

1. Was the evidence insufficient as a matter of law to support a verdict in favor of all the defendants?

2. Did the court err in admitting into evidence defendant State of Montana's exhibit 13A, a movie, which was not listed as an exhibit in the pretrial order?

3. Did the court err in permitting defense counsel to

mention plaintiff's remarriage during voir dire of the jury?

4. Did the court err in giving a jury instruction which stated that the contractor's conformance to the Department's instructions in carrying out work on the project was relevant to the determination of whether the contractor breached its duty of care toward the plaintiffs?

5. Should Highway Patrolman Billedeaux have been permitted to testify as to the adequacy of the signing at the scene of the accident?

6. Did the trial court err in refusing to admit into evidence the Manual on Uniform Traffic Control Devices for Streets and Highways?

7. Did the court err in refusing to admit evidence of the construction contract between the State of Montana and the contractors?

8. Did the court err in refusing to admit certain demonstrative exhibits presented by the plaintiff?

ISSUE NO. 1:

Was the evidence insufficient as a matter of law to support a verdict in favor of all the defendants?

This issue is not addressed in view of our holding that the case must be remanded for a new trial as to all three defendants because of the prejudicial admission and exclusion of evidence by the trial court as hereinafter set forth.

ISSUE NO. 2:

Did the court err in admitting into evidence defendant State of Montana's exhibit 13A, a movie, which was not listed as an exhibit in the pretrial order?

The court erred in admitting into evidence defendant State's exhibit 13A, a six-minute movie film demonstrating the effect of driving a 1971 Ford Pinto over an abrupt edge.

On March 6, 1979, a pretrial conference was held. Due to the numerous exhibits to be presented at the time of trial the

parties agreed that they would confer on the status of various exhibits to be set forth in the pretrial order. Plaintiff prepared a pretrial order based upon a meeting between the various counsel of the parties and it was ready for signing April 9, 1979, one week before the trial date. On that date the State for the first time advised plaintiff that it intended to introduce exhibit 13, a California Department of Transportation report on "The Effect of Longitudinal Edge of Paved Surface Drop-Off on Vehicle Stability", and on that date furnished counsel with copies of exhibit 13. The pretrial order had to be interdelineated to include this exhibit. State's exhibit 13 made reference to movies that were made of tests conducted in making the report.

The first notice plaintiff had of the State's intention to introduce any film exhibits was when the State, in its opening statement, indicated that movie films would be shown to the jury. Exhibit 13A was not listed as an exhibit in the pretrial order.

Immediately after the opening statement, the plaintiff objected to the introduction of any movies for two reasons:

1. They were not listed as an exhibit in the pretrial order, and

2. The movies were not available for pretrial examination to determine their relevancy or comparability to the facts and circumstances involved in this case.

During argument on the plaintiff's objection, the court was advised that exhibit 13A was an edited six-minute summary film of tests demonstrating the effect of driving a 1971 Ford Pinto over an abrupt edge. The movies referred to in exhibit 13 consisted of a six-hour filmed study utilizing 17,000 feet of film involving light, medium and heavy vehicles and a pickup truck, driven by professional race car drivers at different speeds over different edge heights. Plaintiff requested that if the court were going to admit exhibit 13A, that he should be

- 5 -

permitted to view all of the movie test films, since exhibit 13A constituted only a six-minute summary of a six-hour film test. The court ruled exhibit 13A admitted upon the court's requirement and the State's assurance that all of the movie films taken during the tests would be shown to the plaintiff. On Monday, April 23, 1979, six days after the court's ruling, the State's counsel showed exhibit 13A to all counsel, except counsel for defendant Bliesner. On April 24, 1979, counsel for the State advised the court that the other test film was not secured and therefore could not be shown to the parties. In spite of this, the court permitted exhibit 13A to be shown to the jury by Paul O'Shea, an expert called by the State, whose name had not been listed in the pretrial order as a witness the State intended to call.

The pretrial order " . . . controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice." Rule 16, M.R.Civ.P. The whole purpose of the pretrial conference and the pretrial order is to prevent the type of situation that occurred in this case. Apparently defense counsel for the State started to prepare its defense a week before trial. No justification or excuse was offered to show why exhibits 13 and 13A were not mentioned at the pretrial conference held a month before the trial. No explanation was made by counsel for the State why the entire test film was not made available to the plaintiff after he had assured the court a week before that the entire test film would be made available to the plaintiff. Indeed, counsel for defendant Bliesner was not shown State's exhibit 13A until it was shown in the judge's chambers, just prior to its being shown to the jury. These tactics are contrary to the letter and spirit of all pretrial discovery which is to prevent surprise, to simplify the issues, and to permit counsel to prepare their case for trial on the basis of the pretrial order.

The trial court abused its discretion in admitting defendant's exhibit 13A under these circumstances. 3 Moore's Federal Practice, ¶16.19. Burdis v. Texas and Pacific Ry. Co., (1978), 569 F.2d 320, 323; First National Bank of Madison v. Harrison (1970), 205 Kan. 315, 469 P.2d 344, 346.

ISSUE NO. 3:

Did the court err in permitting defense counsel to mention plaintiff's remarriage during voir dire of the jury?

Plaintiff filed a motion in limine requesting an order of the court prohibiting counsel from informing the jury of the plaintiff's remarriage. The court granted the motion, except permitted counsel on voir dire examination to ask jurors if they knew Jolene Workman without reference to plaintiff's marriage to her. Disregarding the court's order, counsel for the defendants, McIntyre-Birch, asked the entire jury panel the following question:

> "I have just one other question to ask of you;
> it concerns personnel, people. Are any of you
> -- and this would be addressed to all of you who
> are on the current panel -- are any of you
> acquainted with Mr. Michael Workman's present
> wife? Now, her name is Jolene Workman; do any
> of you know her?"

Evidence of a surviving spouse's remarriage is irrelevant. This is the holding in the great majority of courts deciding this question. Annot., 88 A.L.R.3d 926. Cherrigan v. City and County of San Francisco (1962), 262 Cal.App.2d 643, 69 Cal.Rptr. 42. Kimery v. Public Service Co. of Oklahoma (1977), 562 P.2d 858. The reasons for such a rule is that damages are determined as of the date of death.

Counsel for the defendants assert that the fact of remarriage concerned only damages and since the jury found no liability this is harmless error. Who can say that the jurors did not consider plaintiff's remarriage in deciding the liability issue, especially in this case when the jury consisted of ten women and two men. Similar to efforts to inject insurance coverage into evidence is the obvious intent here to show

remarriage of the surviving spouse to mitigate or eliminate damages.

An admonition by the court to disregard the remarriage will not suffice -- "the goose is already cooked." This fact cannot be erased from the minds of the jurors. The plaintiff, already overburdened with the cost of pretrial discovery and advance fees and transportation expenses of experts and other witnesses waiting to testify, cannot afford, in most cases, to move for a mistrial. The defendants, on the other hand, could care less about the plaintiff's additional expenses involved in the event of a mistrial. This tactic of putting the remarriage of the plaintiff before the jury after being ordered not to do so is prejudicial and reversible error.

ISSUE NO. 4:

Did the court err in giving a jury instruction which stated that the contractor's conformance to the Department's instructions in carrying out work on the project was relevant to the determination of whether the contractor breached its duty of care toward the plaintiffs?

The trial court gave the following instruction:

"In determining whether the contractor breached any duty to the plaintiffs, you are entitled to consider whether it acted in accordance with the directions and instructions of the State of Montana in carrying out the work on the construction project. Such following of directions and instructions of the State may be considered in determining if the contractor acted reasonably."

The trial court did not err in giving this instruction. Directions and instructions to the contractor by the State if followed by the contractor is one of the considerations that is relevant as to whether or not the contractor acted reasonably. This is not the same as saying that the contractor is not liable if he follows the directions and instructions given to him by the State. This fact, together with all of the other facts and circumstances, are to be utilized by the jury in its consideration of whether or not the contractor was negligent. The mere

- 8 -

following by the contractor of directions and instructions by the State does not relieve the contractor of acting as a reasonable, prudent person under the circumstances. Bush v. Wardell (1974), 165 Mont. 312, 528 P.2d 215.

ISSUE NO. 5:

Should Highway Patrolman Billedeaux have been permitted to testify as to the adequacy of the signing at the scene of the accident?

The following colloquy occurred at trial:

"Q. Officer Billedeaux, I would suppose that, having been with the Patrol for the fourteen years as of 1976 and having driven the fifty thousand miles, approximately, per year for each year of that service, you would have had an opportunity to observe traffic-control devices placed on Montana roads. A. Yes.

"Q. And I would imagine that, with that extensive experience, you would be familiar with the traffic-control devices placed on Montana roads? A. Yes.

"Based upon that familiarity and your experience, do you feel that the road at the time and place of the collision between Mr. Bliesener's vehicle and Mr. Workman's vehicle was adequately signed?

"MR. HADDON: Objection, Your Honor. That calls for an opinion beyond the province of this witness as a matter of law.

"THE COURT: I'll sustain the objection.

"MR. DALE: Your Honor, the further testimony from Officer Billedeaux would be the in camera proceedings that we discussed earlier.

"THE COURT: Very well.

" . . .

"MR. DALE: Your Honor, for the record, we would like to make an offer of proof in regard to the testimony concerning Officer Billedeaux's opinion testimony as to the adequacy of the signs.

"THE COURT: Very well.

" . . .

"Q. Officer Billedeaux, based upon your experience with Montana traffic-control devices and your seventeen years as a member of the Montana Highway Patrol, fourteen years as of 1976, and having driven these fifty thousand miles per year, in your opinion, was the roadway at the time and place of the collision between Mr.

Bliesner's vehicle and Mr. Workman's vehicle adequately signed?  A.  No.

"Q.  And upon what do you base that opinion?  A. A construction area, in order to enforce the thirty-five mile limit, must be -- have a legend that indicates that thirty-five miles an hour. The motoring public has to be fully aware.  If there is a hazard such as this drop-off, there should be something to the effect that the motoring public will know that there is a hazard there when they come down the road.

"Q.  And at the time and place on June 18, 1976, what was present to advise them of this hazardous condition?  A.  Nothing."

The Montana Rules of Evidence provide as follows:

"Rule 702.  <u>Testimony by Experts.</u>
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

"Rule 704.  <u>Opinions on Ultimate Issue.</u>
Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

An expert witness may be qualified by professional, scientific or technical training, or have practical experience in some field or activity conferring upon him a special knowledge not shared by mankind in general, and one who has been engaged for a reasonable time in a particular profession, trade, or calling will be assumed to have the ordinary knowledge common to persons so engaged.  Nesbitt v. City of Butte (1945), 118 Mont. 84, 163 P.2d 251.

The opinion of a witness on a material question of science, art or trade in which he is skilled is admissible in evidence.  The determination of the qualification of a skilled or expert witness is a matter largely within the discretion of the trial judge, and in the absence of a showing of abuse, ordinarily will not be disturbed.  Graham v. Rolandson (1967), 150 Mont. 270, 435 P.2d 263; Nesbitt v. City of Butte, supra.

Highway Patrol Officer Billedeaux was properly qualified as an expert, and was in possession of sufficient facts to

- 10 -

warrant the conclusions he stated. Rude v. Neal (1974), 165 Mont. 520, 530 P.2d 428. Expert opinion evidence is admissible in explaining the cause of a particular accident. Pachek v. Norton Concrete Co. (1972), 160 Mont. 16, 499 P.2d 766. The trial court abused its discretion in refusing to allow his testimony.

ISSUE NO. 6:

Did the trial court err in refusing to admit into evidence the Manual on Uniform Traffic Control Devices for Streets and Highways?

All parties agree that the 1971 federal Manual on Uniform Traffic Control Devices for Streets and Highways (manual) published by the U. S. Department of Transportation had been adopted and was legally applicable on June 18, 1976. The manual sets forth certain warrants or specifications describing the physical requirements necessary to justify the authorization and use of the various warning signs recommended by the manual. Pertinent sections of the manual provide in part:

> "1A-4. In the Manual sections dealing with the design and application of traffic control devices, the words 'shall', 'should' and 'may' are used to describe specific conditions concerning these devices. To clarify the meanings intended in this Manual by the use of these words, the following definitions apply:
>
> "1. SHALL - A mandatory condition. Where certain requirements in the design or application of the device are described with the 'shall' stipulation, it is mandatory when an installation is made that these requirements be met.
>
> "2. SHOULD - An advisory condition. Where the word 'should' is used, it is considered to be advisable usage, recommended but not mandatory.
>
> "3. MAY - A permissive condition. No requirement for design or application is intended.
>
> " . . .
>
> "2A-1. Signs should be used only where warranted by facts and field studies. Signs are essential where special regulations apply at specific places or at specific times only, or where hazards are not self-evident. . .

"2A-7. Functionally, signs are classified as follows:

"Regulatory signs give notice of traffic laws or regulations.

"Warning signs call attention to conditions on, or adjacent to, a highway or street that are potentially hazardous to traffic operations.

"Guide signs show route designations, destinations, directions, distances, services, points of interest, and other geographical or cultural information.

" . . .

"2C-1. Warning signs are used when it is deemed necessary to warn traffic of existing or potentially hazardous conditions on or adjacent to a highway or street. Warning signs require caution on the part of the motorist and may call for reduction of speed or a maneuver in the interest of his own safety and that of other motorists and pedestrians. Adequate warnings are of great assistance to the vehicle operator and are valuable in safe-guarding and expediting traffic. . ."

All of the parties and their counsel concede this accident happened on a highway under construction. The manual in Part VI, provides for "Traffic Controls for Street and Highway Construction and Maintenance Operations." Section 6A-3 provides in part:

". . . It is emphasized that these are minimum desirable standards for normal situations and that additional protection must be provided when special complexities and hazards prevail. The protection prescribed for each situation shall be based on the speed and volume of traffic, duration of operation, and exposure to hazards. . ."

Section 6A-4 provides:

"The provisions for public protection established herein are for application by (1) State highway department, county, and municipal forces performing construction or maintenance operations on roads and streets, (2) contractors employed in road or street construction or maintenance under contract to any governmental authority . . .

"These standards, as part of the Manual on Uniform Traffic Control Devices, should be adopted by all public authorities concerned with highways, and should be given effect by official instructions to employees and by incorporation into the specifications for all contracts." (Emphasis added.)

In this case the only signs erected were length of

- 12 -

construction signs located at the limits of the construction pro-
ject which read:  "Road Construction, 10 miles."  The manual pro-
vides in Section 6B-36, in part, as follows:

> The Length of Construction sign shall be erected
> at the limits of any road construction or main-
> tenance job of more than 2 miles in extent,
> where traffic is maintained through the job. . ."

No "Advance Road Construction Sign" was evident as provided by
section 6B-15 which reads in part:

> "The Advance Road (Street) Construction sign
> shall be located in advance of the initial acti-
> vity or detour a driver may encounter, and is
> intended for use as a general warning of
> obstructions or restrictions.  It carries the
> legend ROAD (STREET) CONSTRUCTION (1500) FT. . ."
> (Emphasis added.)

No regulatory signs were present as provided in Section 2B-1:

> "Regulatory signs inform highway users of traf-
> fic laws or regulations and indicate the appli-
> cability of legal requirements that would not
> otherwise be apparent.  These signs shall be
> erected wherever needed to fulfill this purpose,
> but unnecessary mandates should be avoided.  The
> laws of many States specify that certain regula-
> tions are enforceable only when made known by
> official signs."
>
> " . . .
>
> "Regulatory signs normally shall be erected at
> those locations where regulations apply.  The
> sign message shall clearly indicate the require-
> ments imposed by the regulation and shall be
> easily visible and legible to the motorist
> concerned."  (Emphasis added.)

One of the regulatory signs is the speed limit sign.  Section
2B-13 in the manual provides in part:

> "Speed Limit signs, indicating speed limits for
> which posting is required by law, shall be
> located at the points of change from one speed
> limit to another. . ."
>
> "At the end of the section to which a speed
> limit applies, a Speed Limit sign showing the
> next speed limit shall be erected. . ."
> (Emphasis added.)

Section 61-8-203(1), MCA, provides:

> "Department of highways to sign all state
> highways. (1) The department of highways shall
> place and maintain traffic-control devices, con-
> forming to its manual and specifications, upon
> all state highways it considers necessary to
> indicate and to carry out this chapter and
> chapter 9 or to regulate, warn, or guide

- 13 -

traffic." (Emphasis added.)

The State and the contractor, during the trial and in their briefs, assert that the single sign "Road Construction, 10 miles" required a speed not in excess of 35 m.p.h. because of the provision of section 61-8-303(2)(b), MCA, on a highway under construction or repair. Yet all of the traffic was moving at 55 m.p.h.

On December 1, 1971, the Manual on Highway Traffic Control Devices was adopted by the Montana Highway Commission. The manual was approved by the Federal Highway Administrator as the National Standard for all highways open to public travel in accordance with Title 23, U.S. Code, Sections 109(b), 109(d) and 402(a).

In deciding the Court's opinion in Williams v. Maley (1967), 150 Mont. 261, 434 P.2d 398, Justice Castles, who likewise wrote the opinion in the Faucette case, stated:

> "In the . . . case of Faucette v. Christensen, 145 Mont. 28, 34, 400 P.2d 883, a driver was charged with negligence per se for passing within one hundred feet of an intersection, an action prohibited by statute. However, the intersection was marked by a broken white line, which under the manual indicates that in such an area passing is permitted. This Court asked the question:

> "' . . . Should not the other statutory "rules of the road" and the highway markings formally established by the highway commission under statutory authorization have equal dignity? Should not the statutes, then, be construed together and harmonized in determining questions of negligence. We believe they should.'

> " . . .

> " . . . It is clear from a reading of the legislation authorizing the Highway Commission to adopt a uniform manual and authorizing the Commission to sign the highways in accordance with that manual, that the mere adoption of the manual did not give it a status equal to that of a statute. R.C.M. 1947, §32-2134, authorizes the Highway Commission to sign the highways of the state in conformity with the manual 'as it shall deem necessary.' The same statute makes it unlawful for anyone else to erect signs upon highways. Thus, until the Highway Commission has acted to direct the erection of a sign, there is no duty placed upon anyone to act in a certain manner just because the Manual on Uniform Traffic Control Devices would seem to

indicate that such a sign should be erected. Without direction by the Highway Commission there is no duty to place a sign." 150 Mont. 266, 268, 434 P.2d at 401.

In Runkle v. Burlington Northern (1980), ____Mont.____, ____ P.2d____, 37 St.Rep. 995, 1002, the Court said:

"The Federal-Aid Highway Act of 1973 represents an effort by the federal government to improve the safety of grade crossings, and to provide funding for the same. That act does not lessen in any degree the duty, statutory or common law, of a railroad to maintain a good and safe crossing. The Manual on Uniform Traffic Control Devices (MUTCD), promulgated by the Montana Highway Department, may be considered as a standard or norm to be used for traffic control devises. It does not have the force and effect of law in determining the duties and responsibilities of a railroad with respect to the safety of grade crossings. Thus the fact that the Montana Highway Department or the town of Troy had not officially acted to require the railroad to provide traffic control devices other than the crossbucks is not in itself sufficient to absolve the railroad of its common law duty, if it existed, to provide a good and safe crossing. In addition it was a jury question whether under the circumstances known to the railroad at and before this accident, the railroad itself should have reduced the speed of its trains over the Third Street crossing. This Court stated these principles in Jarvella v. Northen Pac. Ry. Co. (1935), 101 Mont. 113, 53 P.2d 446, 450, when it said:

"'It is noteworthy, in passing, that the mere fact that no statute exists, or that no order by an authorized person has been made requiring gates or other safety devices at crossings, will not ipso facto relieve the railway company from the duty of providing safety devices at crossings sufficiently dangerous to require them.'

"We considered the status of the Manual on Uniform Traffic Control Devices in Williams v. Maley (1967), 150 Mont. 261, 267-69, 434 P.2d 398, 401-02. There this Court said that the manual did not have a status equal to statute. We also made reference to the fact that it was unlawful for anyone other than the State Highway Commission to erect signs on highways. However, neither that case, nor section 61-8-203, MCA, should be read to mean that a railroad in the exercise of ordinary care may not itself place warning devices and signs upon its own property or volunteer to place the same on state roadways upon notification to the State Highway Department. It would not thereby either commit a misdemeanor or create a public nuisance." (Emphasis added.)

In this case, in addition to the provisions of the manual which apply to both the State and the contractor, the contract

between the State and the contractor provides:

"VIII.  SAFETY; ACCIDENT PREVENTION

"In the performance of this contract, the contractor shall comply with all applicable Federal, State and local laws governing safety, health and sanitation.  The contractor shall provide all safeguards, safety devices and protective equipment and take any other needed actions, on his own responsibility, or as the State highway department contracting officer may determine, reasonably necessary to protect the life and health of employees on the job and the safety of the public and to protect property in connection with the performance of the work covered by the contract."  (Emphasis added.)

It is hard to conceive how a contractor could be charged with a misdemeanor or with creating a public nuisance with this provision in the contract.

What was pronounced in Runkle applies with equal import here to the State and to the contractor.  The trial court erred in refusing to admit the Manual on Uniform Traffic Control Devices for Streets and Highways.  See Schaeffer v. Kansas Dept. of Transp. (Kan. 1980.), 608 P.2d 1309.

The plaintiff offered the entire manual in evidence.  When this case is retried, the plaintiff should be required to introduce only those portions of the manual that have relevancy to this case.

ISSUE NO. 7:

Did the court err in refusing to admit evidence of the construction contract between the State Department and the contractors?

Plaintiff, in cross-examining a defendant contractor's witness, sought to introduce certain provisions in the contract between the State and the contractor regarding certain traffic control devices mentioned in a payment schedule in the contract that could have been available and utilized by the contractor or the State at the job site.  Plaintiff argues that since a payment schedule for these devises was included in the contract, that this constituted notice to the State and the contractor that these devices could have been utilized prior to the accident.

- 16 -

These were yellow and white reflectorized temporary striping tapes. The court permitted these exhibits to be admitted for demonstrative purposes but refused the introduction of the provisions of the contract.

The trial court did not err in refusing to permit the introduction of the contract provisions sought to be introduced by the plaintiff. The question is whether or not certain traffic control devices should have been used by the State or the contractor in its exercise of due care under the circumstances. The provision in the contract providing a payment schedule if the devices were used has no probative value and is irrelevant.

ISSUE NO. 8:

Did the court err in refusing to admit certain demonstrative exhibits presented by the plaintiff?

Plaintiff offered in evidence an "abrupt edge sign" and a photograph of a stretch of highway which included the "abrupt edge sign" for demonstrative purposes. The trial court refused to admit both exhibits. The exhibits were intended to illustrate plaintiff's expert's testimony that this traffic control "abrupt edge" sign is used where such a situation exists.

Exhibits for demonstrative purposes do not depend upon whether or not the objects they portray could be described in words, but on whether or not it would be helpful to permit the witness to supplement his description by their use. 29 Am Jur 2d, Evidence §785. Exhibits are inadmissible in evidence for demonstrative purposes only when they do not illustrate or make clearer some issue in the case--that is, where they are irrelevant or immaterial--or where they are of such a character as to prejudice the jury. 29 Am Jur 2d, Evidence §785. These exhibits were relevant and would not prejudice the jury. To refuse to admit plaintiff's exhibits for demonstrative purpose was an abuse of discretion by the trial court. Brown v. North

- 17 -

Am. Mfg. Co. (1978), 176 Mont. 98, 576 P.2d 711, 35 St. Rptr. 194.

For the foregoing reasons, the judgment is reversed as to all three defendants and the cause remanded for a new trial.

_____
Hon. John M. McCarvel, District Judge, sitting in place of Mr. Justice Daniel J. Shea.

We concur:

_____
Chief Justice

_____

_____

_____
Justices