Jonathan Carl PATCH, Plaintiff and Appellant,

v.

David SEBELIUS and Sherman Graber, d/b/a Graber Trucking, Defendants and Appellees,

and

Ray Hunter, Industrial Builders, Inc., and Philip Stremick, d/b/a Philip N. Stremick Construction, Defendants and Appellees.

Civ. Nos. 10478, 10516.

Supreme Court of North Dakota.

May 10, 1984.

Damon E. Anderson (argued) and Lloyd H. Noack, Grand Forks, for plaintiff and appellant.

No appearance or brief on behalf of defendants and appellees Sebelius and Graber.

E.T. Conmy III, of Nilles, Hansen, Magill & Davies, Fargo, for defendants and appellees Ray Hunter and Industrial Builders, Inc.

Jeffrey R. Hannig, of Gunhus, Grinnell, Klinger, Swenson & Guy, Moorhead, Minn., for defendant and appellee Philip Stremick, d/b/a Philip N. Stremick Construction.

VANDE WALLE, Justice.

Jonathan Carl Patch appeals from the amended judgment of the District Court of Grand Forks County entered on July 21, 1983. We reverse and remand for a new trial.

This action arises out of a traffic collision which occurred in an area where bridge and road construction was being performed under contract with the State of North Dakota by defendants Industrial Builders, Inc., and Philip N. Stremick, doing business as Philip N. Stremick Construction. Stremick was constructing two new lanes to the south of the existing highway which would convert it into a four-lane divided roadway, and Industrial Builders was to build two bridges on the new roadway.

Patch was seriously injured when the vehicle he was driving collided with a semi-trailer driven by David Sebelius and owned by Sherman Graber, doing business as Graber Trucking. At the time of the accident, Ray Hunter, an Industrial Builders employee, was attempting to make a left-hand turn from the existing highway onto a construction approach located in a valley between two hills, and a line of traffic was stopped behind him. As Sebelius approached the line of vehicles he applied his brakes, which caused his vehicle to jackknife into the opposite lane and strike Patch's vehicle.

Patch initiated this action against Sebelius, Graber, Hunter, Industrial Builders, Stremick, the State of North Dakota, the State Highway Department, and the State Highway Commissioner. The claims against the State, the Highway Department, and the Highway Commissioner were dismissed on the basis of sovereign immunity, and we affirmed the dismissal. *Patch v. Sebelius*, 320 N.W.2d 511 (N.D.1982).

The action against the remaining defendants was tried to a jury. The jury found that Patch was 5 percent negligent, that Sebelius and Graber were 95 percent negligent, and that Hunter, Industrial Builders, and Stremick were not negligent. Patch appeals, alleging that the district court erroneously instructed the jury regarding the duty of Industrial Builders and Stremick to place warning signs and that the court erroneously prohibited testimony of Patch's expert witness, Dr. George W. Brown.[1]

The trial court held that, as a matter of law, the contractors did not have the authority to erect warning signs other than those specifically enumerated in the plans and specifications.[2] The court instructed the jury that it could find Industrial Builders and Stremick liable only if they had not

---

1. Although Patch raises numerous other issues, we will limit our discussion to those issues which are essential to disposition of the appeal or which are likely to arise on retrial.

2. It appears that the only warning signs in place on July 24, 1978, were the signs at the east and west entrances to the thirteen-mile construction zone, which warned that there was construction for the next thirteen miles.

placed all the warning signs required by the plans and specifications. The court refused to instruct the jury that the contractors had an independent duty, based upon the contract provisions, to place additional warning signs when the safety of the motoring public was threatened by hazards within the construction zone. The court based its refusal to recognize such an independent duty upon the provisions of the *Manual on Uniform Traffic Control Devices* (MUTCD),[3] which has been adopted by the North Dakota State Highway Commissioner pursuant to Section 39–13–06, N.D.C.C.

The defendant contractors contend that Section 2A–3 of the MUTCD grants to the State Highway Department exclusive authority respecting placement of signs upon highways in North Dakota. Section 2A–3 provides, in pertinent part:

"*2A–3 Legal Authority*

"Traffic signs shall be placed only by the authority of a public body or official having jurisdiction, for the purpose of regulating, warning, or guiding traffic. No traffic sign or its support shall bear any message that is not essential to traffic control. . . .

"Any unauthorized sign placed on the highway right-of-way without authority by a private organization or individual constitutes a public nuisance. All unofficial and nonessential signs should be removed.

"*With proper authority being given, construction contractors* and public utility companies *are permitted to erect temporary construction and maintenance signs at work sites to protect the public,* equipment, and workmen, provided that such signs conform to the standards of this Manual." [Emphasis added.]

The MUTCD provides further guidance on the issue. Part VI of the MUTCD, entitled "Traffic Controls for Street and Highway Construction and Maintenance

Operations," sets forth guidelines for use of traffic-control devices in conjunction with highway construction:

"*6A–1 Need for Standards*

"Problems of traffic control occur when traffic must be moved through or around road or street construction, maintenance operations, and utility work. No one standard sequence of signs or other control devices can be set up as an inflexible arrangement for all situations due to the variety of conditions encountered.

"The following treatment of signs, signals, and markings for street and highway construction and maintenance work provides a comprehensive guide to be applied as a national standard. This Part of the Manual establishes principles to be observed in the design, installation, and maintenance of traffic control devices, and prescribes standards where possible, and is designed so that it can be used independently. To that end some material concerning specifications and devices having more general application is repeated here from preceding parts of this Manual.

"These principles and standards are directed to the safe and expeditious movement of traffic through construction and maintenance zones and to the safety of the work force performing these operations."

Section 6A–4 of the MUTCD makes it clear that the provisions of Part VI apply to contractors:

"*6A–4 Responsibility*

"The provisions for public protection established herein are for application by (1) State highway department, county, and municipal forces performing construction or maintenance operations on roads and streets, (2) contractors employed in road or street construction or maintenance under contract to any governmental authority, and (3) all others, including employees of public utility companies, performing any work on high-

---

**3.** At the time of the incident involved in this case, the 1971 edition of the MUTCD was in effect in North Dakota. A subsequent edition of the MUTCD was published in 1978, but the 1971 provisions are applicable to this case.

ways or so closely adjacent as to create hazards for the public or for themselves.

"These standards, as a part of the Manual on Uniform Traffic Control Devices, should be adopted by all public authorities concerned with highways, and should be given effect by official instructions to employees and by incorporation into the specifications for all contracts.

"It is important that the authorities having jurisdiction be able to require proper protection, that responsibility be clearly assigned, adequate training of personnel be provided, and that there be adherence to the standards and provisions of this Manual."

The contracts between the State and the defendant contractors incorporated the Required Contract Provisions for Federal-Aid Construction Contracts. Section VIII of the Required Provisions states:

"VIII. SAFETY; ACCIDENT PREVENTION

"In the performance of this contract, the contractor shall comply with all applicable Federal, State and local laws governing safety, health and sanitation. *The contractor shall provide all safeguards, safety devices and protective equipment and take any other needed actions, on his own responsibility,* or as the State highway department contracting officer may determine, *reasonably necessary to protect* the life and health of employees on the job and *the safety of the public* and to protect property in connection with the performance of the work covered by the contract." [Emphasis added.]

The construction contracts also include by incorporation the Standard Specifications for Road and Bridge Construction of the North Dakota State Highway Department. Section 107 of the Standard Specifications, entitled "Legal Relations and Re-

sponsibility to Public," contains the following provision:

"107–10 Barricades, Warning Signs, Lights and Flagging

"The Contractor shall provide, erect and maintain all necessary barricades, suitable and sufficient lights, danger signals, signs and other traffic control devices, and shall take all necessary precautions for the protection of the work and safety of the public.... Suitable warning signs shall be provided to properly control and direct traffic."

Interpretation of the contract provisions and construction of the MUTCD and statutes were questions of law, within the province of the district court. The court held that, as a matter of law, the State Highway Department had exclusive control over placement of warning signs, and that the contractors' only duty was to place the signs which were specifically provided for in the plans and specifications. The court instructed the jury that Stremick and Industrial Builders could be found liable only if they failed to place warning signs which were enumerated in the plans and specifications.[4]

The crucial question presented is whether or not the State Highway Department granted authority to the contractors to erect warning signs other than those specifically enumerated in the plans and specifications. We conclude that it did.

In *Workman v. McIntyre Construction Co.*, 617 P.2d 1281 (Mont.1980), the plaintiff brought an action against the State of Montana and the contractors, alleging that inadequate warning signs in a construction zone proximately caused the accident in which his wife was fatally injured. The court quoted at length from the MUTCD, including the provisions noted above, and also quoted Section VIII of the Required Contract Provisions for Federal-Aid Construction Contracts. The court indicated

---

**4.** Patch asserts that the court erred in refusing to allow the jury to examine the contracts between the defendant contractors and the State. The contracts involved in this case, including the regulations and specifications incorporated therein, were voluminous, and contained extra-

neous and possibly prejudicial information. It was appropriate for the court under these circumstances to instruct the jury on only those provisions which were relevant to the issues raised by the parties.

that this contract provision authorized the contractor, on his own responsibility, to place warning signs to protect the public, notwithstanding the provisions of the MUTCD.[5]

The Supreme Court of Minnesota was faced with a similar issue in *Ferguson v. Benson*, 309 Minn. 160, 244 N.W.2d 116 (1976). In *Ferguson*, the contractors were not working on the existing lanes of travel, but were hauling fill from the west side of the highway to the east side. When heavy equipment crossed the existing highway it deposited dirt upon the roadway, which subsequently turned into mud when it rained. The slippery conditions caused the accident in which the plaintiff was injured.

The contractors alleged that they had no right or authority to place warning signs to alert the public to the hazards, citing a Minnesota statute which provided that the "commissioner shall place and maintain ... traffic-control devices," and that "[n]o other authority shall place or maintain any traffic-control device upon any highway under the jurisdiction of the commissioner except by the latter's permission." See Minn.Stat.Ann. § 169.06, subd. 2; *Ferguson, supra*, 309 Minn. at 164–165, 244 N.W.2d at 119. In rejecting this argument, the Minnesota Supreme Court stated that the statute

"... was never intended to prohibit a contractor from warning the public of hazardous road conditions. The statute specifically excepts from its coverage the placement of any traffic control device for which the commissioner has given his permission. By the contract with highway construction contractors, the commissioner gives contractors permission to

erect warning signs whenever necessary to ensure the safety of the general public." 309 Minn. at 165, 244 N.W.2d at 119.

Similarly, we believe that Section 2A–3 of the MUTCD was never intended to prohibit a contractor from warning the motoring public of hazardous conditions.[6]

We also agree with the policy considerations noted by the Minnesota Supreme Court in support of its conclusion:

"Since a road contractor is in the best position to know of any dangerous conditions created by its activities, it is only logical that it be required to warn unwary motorists of such dangerous conditions. This is especially true in the instant case where the hazardous condition created by the contractor is unlikely to be detected or immediately corrected by the Highway Department." 309 Minn. at 166–167, 244 N.W.2d at 120.

If we were to adopt the result urged by the defendant contractors in the instant case, the safety of the traveling public would be severely jeopardized. If the contractor is powerless to place additional warning signs, he would be unable to warn the motoring public of sudden emergency situations which might arise within the construction zone. Furthermore, we cannot expect the State Highway Department to be prophetic. Plans and specifications for highway construction projects are prepared months in advance, whereas hazardous conditions may arise on the project without warning. When hazardous conditions occur, the contractor is in the best position to know of the danger and to take appropriate steps to warn the traveling public.

5. We recognize that in *Workman* the State of Montana was a named defendant, whereas the State of North Dakota, the Highway Department, and the Highway Commissioner have sovereign immunity in this case. Nevertheless, the principle enunciated in *Workman*, that the MUTCD does not prohibit a contractor from placing additional warning signs when the contract authorizes him to place signs to protect the public, is equally applicable when the State is not a party to the action.

6. The defendant contractors contend that *Ferguson* is inapplicable to the instant case because the MUTCD does not have the force and effect of law in Minnesota, but is merely advisory. See *Poppenhagen v. Sornsin Construction Co.,* 300 Minn. 73, 220 N.W.2d 281 (1974). We note, however, that the argument of the defendant contractors in *Ferguson* was premised upon the Minnesota statute, which contained provisions similar to Section 2A–3 of the MUTCD.

We conclude that the trial court erred in determining that the contractors had no independent duty to erect warning signs other than those specifically enumerated in the plans and specifications. The court misconstrued Section 2A–3 of the MUTCD, which clearly provides that contractors are permitted to erect warning signs when authority has been given by the Highway Department. By the terms of the construction contracts, the Commissioner authorized Industrial Builders and Stremick to erect additional warning signs when necessary to protect the safety of the public. It was for the jury to decide whether or not the defendant contractors breached this duty when they failed to erect additional warning signs under the circumstances presented in this case.[7]

◾ Stremick argues that he should not be held liable in any event, because he was not performing work on the existing lanes of Highway 2 and did not create the hazardous condition which existed. In support of this argument, Stremick cites Sections 314 and 315 of the *Restatement (Second) of Torts.* Section 314 provides:

"*§ 314. Duty to Act for Protection of Others*

"The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action."

The situation in this case is hardly akin to one in which a bystander fails to render aid to another in danger. Stremick contractually agreed to take all necessary precautions for the protection of the traveling public's safety. Section 324A of the *Restatement* sets forth the applicable principle:

"*§ 324A. Liability to Third Person for Negligent Performance of Undertaking*

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as

necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

"(a) his failure to exercise reasonable care increases the risk of such harm, or

"(b) he has undertaken to perform a duty owed by the other to the third person, or

"(c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

Stremick contracted to perform services to the State, including services necessary for the protection of the public. If he failed to exercise reasonable care in performing these services, he is liable to third parties injured as a result. See *Layman v. Braunschweigische Maschinenbauanstalt, Inc.,* 343 N.W.2d 334 (N.D.1983). By his contract with the State, Stremick assumed responsibility to exercise reasonable care to protect the public within the thirteen-mile construction zone, over which he had partial control. It is for the jury as fact finder to determine whether or not Stremick exercised reasonable care in performing his duty.

◾ Stremick also relies upon Section 315 of the *Restatement:*

"*§ 315. General Principle*

"There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

"(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

"(b) a special relation exists between the actor and the other which gives to the other a right to protection."

In the instant case, Stremick's potential liability is not premised upon his failure to

---

**7.** We do not mean to imply that the defendant contractors have breached this duty. That is a fact question to be determined by the jury after

being properly instructed regarding the contractors' duty to place warning signs.

control the conduct of other persons. Stremick's liability, if any, is based upon his failure to erect warning signs necessary to protect the public. This would be a breach of an affirmative duty owed to the public by Stremick himself, *not* a failure to control the actions of third persons.

We conclude that Stremick's liability is a question of fact for the jury to determine.

Patch contends that the trial court erred in refusing to allow his expert witness, Dr. George W. Brown, to testify. If permitted to testify, Dr. Brown allegedly would have stated that a warning sign should have been placed ahead of the crest of the hill to warn of the construction activities in the valley beyond the hill. It is clear from the court's oral ruling at trial that its primary reason for disallowing the testimony was its conclusion that the State had exclusive control over sign placement in the area and that the contractors had no authority to place signs other than those enumerated in the plans and specifications.

Rule 702 of the North Dakota Rules of Evidence states:

### "TESTIMONY BY EXPERTS

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

█ The test for admission of expert testimony is whether or not such testimony will assist the trier of fact and whether or not the witness is qualified as an expert. *South v. National Railroad Passenger Corp.*, 290 N.W.2d 819 (N.D.1980). The determination to admit or not admit expert testimony under Rule 702 rests within the sound discretion of the trial court. *South, supra.*

We have held that the contractors did have the authority to place additional warning signs where necessary to protect the safety of the public. Because we are re-

manding for a retrial, the court will have an opportunity to determine whether or not to admit Dr. Brown's testimony in light of our holding in this case.

█ Patch also contends that the court erred in refusing to instruct that the jury could, in its discretion, award prejudgment interest on damages. Section 32–03–05, N.D.C.C., provides:

"*32–03–05. When interest in discretion of court or jury.* In an action for the breach of an obligation not arising from contract and in every case of oppression, fraud, or malice, interest may be given in the discretion of the court or jury."

We have consistently held that it is within the province of the jury to award prejudgment interest on damages in tort actions pursuant to Section 32–03–05, N.D.C.C. *Vasichek v. Thorsen*, 271 N.W.2d 555 (N.D. 1978); *Braaten v. Grabinski*, 77 N.D. 422, 43 N.W.2d 381 (1950); *Seckerson v. Sinclair*, 24 N.D. 625, 140 N.W. 239 (1912). We conclude that the trial court erred in refusing to instruct the jury that prejudgment interest could be awarded in the jury's discretion.

Although we are reversing the judgment and remanding for a new trial because of the issues of liability and prejudgment interest, we note that none of the parties has raised any issue as to the amount of damages as found by the jury. Thus, there is no reason to retry the issue of damages and, pursuant to Rule 35(b), N.D.R.App.P., the new trial will be limited to the issues of liability and the award of prejudgment interest.

We reverse the judgment of the district court and remand for a new trial consistent with this opinion.

ERICKSTAD, C.J., and SAND and GIERKE, JJ., concur.

SAND, Justice, concurring specially.

I agree that the provisions of the manual on uniform traffic control devices and related matters, including statutes, gave the contractor authority to erect warning

signs. However, after reaching this conclusion, I wish to emphasize that merely concluding that the contractor had this authority but did not exercise it fully, or properly, as may be viewed from hindsight, does not ipso facto make the contractor liable. A number of serious questions of fact remain which need to be resolved. What, if anything, would have been different if a warning sign had been placed in the general vicinity stating the nature of the situation? Furthermore, what would have been an appropriate sign? And where should it have been placed? I make this comment on the basis that a sign stating the road was under construction for the next thirteen miles had been placed. Even using hindsight as to what the sign should have or could have stated, the big question remains, how would it have avoided or prevented the accident? Thus, the serious question is, was it the negligence of the contractor by failing to post an appropriate sign the proximate cause, or was it the negligence of Patch that produced the accident and damages? These questions need to be resolved by taking into account the factual situation as it existed at the time of the accident, which, out of necessity, includes and rests to a great degree upon the manner in which Patch approached the area in which the accident occurred. Generally, seeing a number of cars lined up on the highway is a strong indication that caution should be exercised. This necessarily presents the ultimate question; did Patch, under the circumstances, act in a reasonable, prudent manner?

PEDERSON, Justice, dissenting.

Although I agree with nearly all that is stated by Justice VandeWalle, I believe that a new trial is inconsistent with substantial justice. Accordingly, I dissent from the results. Errors which do not "affect the substantial rights of parties" must be disregarded. Rule 61, North Dakota Rules of Civil Procedure.

If a highway contractor is aware of any hazard to the public, the proximate cause being project activities, within the project site, and the signing required in the contract is inadequate to give notice, there is a duty to request additional warning signs.

The only sign that would have prevented the Patch-Sebelius collision would have been "Road Closed." If the buildup of traffic and the jackknifing of the Sebelius vehicle when the brakes were applied were reasonably foreseeable, then Stremick Construction or Industrial Builders would have had a reason for requesting the closing of the road. The Highway Department should have denied the request because closing the road would not be in the public interest under these circumstances. Neither the Highway Department nor those who contract to improve highways are insurers or guarantors of travelers on public highways whether those highways are under construction at the moment or not. See 40 C.J.S. *Highways* § 254; 39 Am. Jur.2d *Highways, Streets, and Bridges* § 372.

If Ray Hunter's truck had been loaded with marshmallows rather than bridge construction material, the same results would have likely occurred. The collision in this case is not proximately related to the highway project. 40 C.J.S. *Highways* § 264; 39 Am.Jur.2d *Highways, Streets, and Bridges* § 374.