No. 97-076

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 156

STATE OF MONTANA,

Plaintiff and Respondent,

v.

GREGORY LLOYD INGRAHAM,

Defendant and Appellant.

APPEAL FROM: District Court of the Twentieth Judicial District,

In and for the County of Lake,

The Honorable Katherine R. Curtis, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Douglas J. Wold; Wold Law Firm, P.C.; Polson, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General;

Patricia Jordan, Assistant Attorney General;

Helena, Montana

Deborah Kim Christopher, Lake County Attorney;

Polson, Montana

Submitted on Briefs: January 15, 1998

Decided: June 23, 1998

Filed:

_____

Clerk

Justice Jim Regnier delivered the opinion of the Court.

**¶1 Gregory Lloyd Ingraham appeals from a judgment and commitment of the Twentieth Judicial District Court, Lake County, based on a jury verdict convicting him of negligent homicide, criminal endangerment, and criminal trespass to property. We affirm in part, reverse in part, and remand for further proceedings**

consistent with this opinion.

¶2 Ingraham advances twelve issues on appeal, reordered as follows for purposes of our discussion:

¶3 1. Did the District Court err in admitting evidence of various medications detected in Ingraham's blood and urine, as well as those found in his car?

¶4 2. Did the District Court err in admitting evidence of warnings generally given with the various medications detected in Ingraham's system and found in his car?

¶5 3. Did the District Court err in instructing the jury regarding the definition of "knowingly"?

¶6 4. Are convictions for negligent homicide and criminal endangerment legally inconsistent?

¶7 5. Is there sufficient evidence of record to support Ingraham's conviction for criminal endangerment?

¶8 6. Is there sufficient evidence of record to support Ingraham's conviction for negligent homicide?

¶9 7. Did the District Court err in admitting evidence of a second blood alcohol test, the results of which were contained in Ingraham's medical records?

¶10 8. Did the District Court err in excluding a demonstrative videotape from evidence ?

¶11 9. Did the District Court err in admitting expert testimony regarding blood alcohol levels?

¶12 10. Did the District Court err in admitting testimony by paralegal Jeanne Windham?

¶13 11. Did the District Court err in ordering the parties not to contact the jurors after they rendered their verdict?

¶14 12. Did the District Court commit prejudicial cumulative error, thereby entitling Ingraham to a new trial?

PERTINENT FACTUAL AND PROCEDURAL BACKGROUND

¶15 In the early morning hours of October 13, 1995, Ingraham was driving north on Highway 93 near St. Ignatius, in Lake County, Montana. Roughly two miles north of town, Ingraham's vehicle crossed the center line and struck an oncoming Ford Ranger pickup truck, driven by Cynthia Harriman-Larson. Harriman-Larson died in the collision, and her passenger, Delbert Adams, suffered severe injuries.

¶16 On the evening of the accident, Ingraham left his office at roughly 5:00 p.m. He went home, ate a peanut butter sandwich, gathered some hunting gear and his two dogs, and drove to the home of his friend and former client, Ed Starkel. Ingraham arrived at Starkel's residence at 5:30 p.m. and remained for approximately two hours, during which time he drank one-half of a can of beer while helping his friend prepare for a pack trip. Ingraham left Starkel's at 7:30 p.m. and drove to the Rustic Hut in Florence, where he met his friend Jeff Lulow and consumed three or four beers, as well as some popcorn and beer nuts. Ingraham and Lulow left the Rustic Hut in separate cars at roughly 11:30 p.m. and drove to Mustang Sally's in Missoula, where Ingraham had two more beers.

¶17 Ingraham left Mustang Sally's between 1:00 and 1:30 a.m. and began the drive home to Ronan, with his two dogs still in the back seat. Ingraham ate some trail mix while he was driving, and sipped from a beer he found on the floor behind the passenger seat in his car. It was a clear evening, and the two-lane road upon which Ingraham was traveling was dry as he passed through the St. Ignatius area. According to Ingraham's testimony at trial, just moments before the accident he saw headlights from an oncoming vehicle approaching in his lane of traffic. Ingraham shouted, at which point his dogs jumped into the front seat and he pushed them aside. Ingraham testified that the oncoming vehicle remained in his lane and that he thus swerved to the left, in a failed attempt to avoid the head-on collision in which Harriman-Larson was killed and Adams seriously injured.

¶18 Adams, according to his testimony at trial, had spent portions of the day and evening preceding the accident drinking in St. Ignatius and Ronan. Although uncertain on the details, Adams indicated he had a few mid-morning beers at a

friend's house, and then, to the best of his recollection, went home. Sometime later, he visited friends in Ronan and had a few more drinks. He remembered subsequently visiting two bars and having additional drinks, before attempting to hitch a ride home at roughly 2:00 a.m. on the morning of the accident. Shortly thereafter, Harriman-Larson stopped and offered Adams a ride. Thus, with Adams in the passenger seat, Harriman-Larson turned south on Highway 93, heading toward St. Ignatius. Tests revealed that Adams had a blood alcohol content (BAC) of .278.

¶19 Little is known about Harriman-Larson's activities during the evening hours preceding the accident, save for the fact that she spent approximately two hours visiting with her friend, Kay Palmer. Palmer testified that Harriman-Larson came over to her house at approximately 9:00 that evening, and stayed until 11:00 p.m., during which time Harriman-Larson drank two bourbon and waters. Harriman-Larson's activities between the time she left Palmer's house and the time she offered Adams a ride shortly before the accident, remain unknown. Although Harriman-Larson's exact activities remain unknown, forensic scientist Lynn Kurtz performed an alcohol screen on a blood sample taken from Harriman-Larson, which indicated the presence of .07 grams of alcohol per 100 mills of whole blood. Kurtz testified that the blood sample may have been contaminated, however, and stated that testing of Harriman-Larson's vitreous sample revealed a higher BAC of .14. Moreover, forensic toxicologist Susan Rasmussen testified that Harriman-Larson's body fluids contained an "extremely high level" of THC, the chemical substance found in marijuana. Rasmussen explained that tests revealed .297 nanograms of THC per milliliter of blood.

¶20 Adams testified that, shortly after Harriman-Larson began driving south on Highway 93, he saw a vehicle approaching in their lane. Adams remembered Harriman-Larson exclaiming, "Hey what's he doing," and then slowing down before the impact. Because of his injuries, Adams remembers nothing of the events immediately following the collision. He testified that his next memory was of waking up in the hospital three weeks later.

¶21 At 2:30 a.m. that morning Ingraham called his father on the phone from a nearby house which he forcibly entered while its occupants were asleep. Ingraham testified that he told his father, also an attorney, that he had been in an accident and that there were emergency vehicles on the scene. Ingraham's activities immediately following the accident, including leaving the accident scene to make the call, and

breaking into the house, gave rise to some of the charges which were ultimately lodged against him. In fact, the State alleged that Ingraham failed to render aid to Adams by leaving the accident scene.

¶22 Responding to a call from dispatch, Highway Patrol Officer Michael Roth arrived at the accident scene just after 3:00 a.m. and asked Ingraham what had happened. Officer Roth testified that Ingraham first told him he had crossed over the centerline into the southbound lane, but then explained that, "no, we met in the middle of the road, in the middle of the centerline."

¶23 Officer Roth suggested that Ingraham go to the hospital and requested a blood sample. A blood test indicated that Ingraham's BAC was .07 at 4:12 a.m. While treating Ingraham for his injuries, hospital personnel subsequently drew a second blood sample, the testing of which indicated that Ingraham's BAC was .05 at 5:30 a. m.

¶24 Later that day, Officer Roth examined Ingraham's vehicle at an auto body shop in Ronan. Among the items he found in the car at that time were a bottle of lithium carbonate capsules and a prescription bottle of Buspar. Indeed, Ingraham's blood tested positive for the presence of therapeutic levels of lithium, as well as subtherapeutic levels of librium. Moreover, Ingraham's urine tested positive for the presence of nicotine, as well as ephedrine and phenylpropanolamine, two drugs typically found in nonprescription cold medicine. Ingraham's blood also contained traces of caffeine.

¶25 Sometime after 5:00 p.m. on the day following the accident, Jeanne Windham, a paralegal and friend of Ingraham's, picked Ingraham up at the hospital. After first stopping at his house to retrieve some clothing, she drove them to the scene of the accident at Ingraham's request. At trial, Windham offered testimony regarding her conversation with Ingraham at the scene of the accident. Windham recollected Ingraham telling her that his dogs began playing in the back seat and that, as he attempted to keep them from jumping into the front seat, his car swerved to the left just prior to colliding with Harriman-Larson's vehicle.

¶26 On October 30, 1995, the State filed an information charging Ingraham with the felony counts of negligent homicide, in violation of § 45-5-104(1), MCA, and criminal endangerment, in violation of § 45-5-207(1), MCA. The information additionally

charged Ingraham with one count of criminal trespass to property, a misdemeanor, in violation of § 45-6-203(1)(a), MCA. Ingraham entered a plea of not guilty to each count at his November 1, 1995, arraignment. Following a change of venue, Ingraham was tried before a Flathead County jury in July 1996. The jury returned its verdict on July 19, 1996, finding Ingraham guilty on all three counts contained in the information.

¶27 On December 4, 1996, District Court Judge Katherine R. Curtis sentenced Ingraham to eight years in Montana State Prison, with two years suspended for the offense of negligent homicide. Ingraham received a consecutive sentence of eight years in Montana State Prison, with four suspended, for the offense of criminal endangerment. The court sentenced Ingraham to six months in the Lake County Jail, with all time suspended, for the misdemeanor offense of criminal trespass to property. Ingraham filed his notice of appeal on November 18, 1996, and the court entered its written judgment and commitment on December 4, 1996.

## ISSUE 1

¶28 Did the District Court err in admitting evidence of the various medications detected in Ingraham's blood and urine, as well as those found in his car?

¶29 On June 20, 1996, Ingraham filed a motion in limine, asking that the court issue an order precluding argument, evidence, and testimony on a number of subjects. Ingraham specifically moved to exclude testimony regarding the presence of lithium, librium, and other chemicals detected in his blood, as well as bottles of prescription medication found in his car. Ingraham asserted there existed no evidence that the lithium detected in his system impaired him in any way, and argued that the State's own expert toxicologist had testified during a pretrial interview that the presence of librium in his blood had no pharmacological or impairing effect upon Ingraham on the evening of the accident. In the absence of such an effect, Ingraham argued, reference by the State to the presence of either drug in Ingraham's system would not only be irrelevant, but would also cause undue prejudice, mislead the jury, and confuse the issues. For the same reasons, Ingraham similarly argued, the court should also preclude the State "from referring to interactions or warnings about interactions between alcohol and other drugs 'prescribed or recommended' to the defendant or found in his car."

¶30 In response, the State conceded that its expert, James Hutchison, "would testify at trial that, in his opinion, the detected concentrations of either drug probably did not substantially impair [Ingraham's] ability to drive," but effectively argued that fact was of little consequence. Rather, the State asserted the critical fact in this case was that Ingraham had any librium or lithium in his system at all at the time of collision. The State asserted it was entitled to establish that Ingraham's negligence included his "use of potentially dangerous, prescription-required drugs in combination [with] one another." In a July 9, 1996, order, the District Court denied Ingraham's motion to exclude the drug evidence.

¶31 As with any evidentiary ruling, we review the district court's decision for an abuse of discretion. *See State v. Gollehon* (1993), 262 Mont. 293, 301, 864 P.2d 1257, 1263. We leave the determination of whether evidence is relevant and admissible to the sound discretion of the trial judge, and will not overturn the court's determination absent an abuse of discretion. *See Gollehon*, 262 Mont. at 301, 864 P.2d at 1263. *See also State v. Stringer* (1995), 271 Mont. 367, 374, 897 P.2d 1063, 1067; *State v. Passama* (1993), 261 Mont. 338, 341, 863 P.2d 378, 380; *State v. Crist* (1992), 253 Mont. 442, 445, 833 P.2d 1052, 1054.

A. Preservation of Objection for Appeal

¶32 We first address the State's procedural argument that Ingraham waived any objection related to the introduction of the prescription drug bottles found in his car by failing to object to their admission during trial.

¶33 Highway Patrol Officer Roth testified during the second day of trial that he had examined Ingraham's vehicle at a Ronan auto body shop on the day of the accident. Officer Roth stated that, at roughly 1:30 p.m. that afternoon, he retrieved a prescription bottle of Buspar from the inside pocket of the door on the driver's side of Ingraham's vehicle. According to the prescription label on the bottle, the Family Health Pharmacy in Ronan had dispensed the 10 milligram Buspar tablets, which had been prescribed for Ingraham by a Dr. McDonald. Officer Roth also found a bottle of lithium carbonate capsules, which bore no prescription label, in the pocket of the car door. During the fourth day of trial, the State elicited testimony from Michael Freeman, a pharmacist from the Family Health Pharmacy which dispensed the Buspar tablets found in Ingraham's car.

¶34 Ingraham argues the court erred in admitting the prescription bottles into evidence, and in permitting jurors to examine those bottles. In response, the State focuses on Ingraham's motion in limine and argues that Ingraham moved only to prohibit the introduction of the bottles pending the State's ability to establish a proper foundation. The State points to that portion of the transcript which documents Officer Roth's testimony, and argues that because Ingraham offered no objection at trial to the foundation established by the State, or to the introduction of the prescription drug bottles, he cannot now appeal their admission into evidence.

¶35 Review of Ingraham's motion in limine confirms that he indeed moved to preclude the State "from referring in opening statement or in testimony to the . . . presence of other drugs in his . . . car . . . [only] until proper foundation is established." A close review of the remainder of his motion in limine, however, indicates Ingraham additionally moved to more generally preclude the State from "mentioning that medications were found in the defendant's car," and did not condition that portion of his motion upon the State's ability to establish adequate foundation at trial.

¶36 We have repeatedly "approved the use of a motion in limine to preserve an objection for appeal, provided the objecting party makes the basis for his objection clear to the district court." *State v. Fuhrmann* (1996), 278 Mont. 396, 403, 925 P.2d 1162, 1166 (citations omitted). A motion in limine has special advantages in situations such as this. A party may not wish to register an objection in the presence of the jury for tactical reasons, yet may wish to preserve the objection on appeal. This is precisely what Ingraham did. Having reviewed the entire text of Ingraham's motion in limine, we conclude Ingraham properly preserved his objection to the State's introduction of the Buspar and lithium bottles found in his car, and conclude the propriety of their admission by the District Court is an issue properly considered by us on appeal.

B. Relevance

¶37 We turn next to Ingraham's argument that, because the medications detected in his system and found in his car had no impairing effect upon his ability to drive on the evening of the accident, evidence of their presence was not relevant to the question of his alleged negligence or negligent state of mind, and should not have been admitted by the District Court.

¶38 To answer this question, we look for initial guidance to the Montana Rules of Evidence which govern the admission of evidence. Pursuant to Rule 402, M.R.Evid., "[a]ll relevant evidence" is generally admissible. Conversely, "[e]vidence which is not relevant is not admissible." Rule 402, M.R.Evid. Rule 401, M.R.Evid., defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

¶39 In *Havens v. State* (Mont. 1997), 54 St. Rep. 1108, 945 P.2d 941, a recent civil negligence case arising from an automobile accident, we had occasion to determine the relevancy of evidence indicating that one of the drivers had consumed alcohol on the day of the accident and had tested positive for the presence of marijuana consumed some four days earlier. In that case, Havens sustained severe injuries when the motorcycle he was driving collided with an automobile exiting the parking lot of a nearby store. *Havens*, 54 St. Rep. at 1109, 945 P.2d at 942. Havens sued the State of Montana, alleging its negligent failure to install a stop light at the parking lot's entrance caused the accident in which he was injured. *Havens*, 54 St. Rep. at 1109, 945 P.2d at 942. In its defense, the State alleged contributory negligence on Havens' part, asserting his consumption of alcohol earlier that day had effectively impaired his ability to react and safely operate his motorcycle. *Havens*, 54 St. Rep. at 1109, 945 P.2d at 941.

¶40 Prior to trial, Havens filed a motion in limine, seeking to exclude evidence of his alcohol consumption on the day of the accident. *Havens*, 54 St. Rep. at 1109, 945 P.2d at 941. Havens objected to the introduction of the results from a toxicology report which indicated he had a BAC of .068 and tested positive for the presence of marijuana. *Havens*, 54 St. Rep. at 1108, 945 P.2d at 941. The District Court denied Havens' motion in limine in light of the State's assurance "that it would produce testimony linking Havens' alcohol consumption as a contributory factor in the accident." *Havens*, 54 St. Rep. at 1110, 945 P.2d at 943. At trial, however, the State simply failed to demonstrate a "connection between Havens' alcohol consumption and the cause of the accident." *Havens*, 54 St. Rep. at 1110, 945 P.2d at 943. Instead, the uncontroverted evidence suggested that the presence of alcohol in Havens' system played no part in causing the collision. *Havens*, 54 St. Rep. at 1110, 945 P.2d at 943.

¶41 Following a verdict in the State's favor, Havens moved for a new trial on the grounds that the court should have excluded "the evidence regarding Havens'

alcohol consumption and the results of the toxicology report." On appeal from the District Court's decision denying Havens' motion for a new trial, we held that, absent a demonstrable causal link between the presence of alcohol and the accident, evidence of Havens' alcohol consumption was irrelevant and inadmissible. *Havens*, 54 St. Rep. at 1110, 945 P.2d at 944. We specifically concluded that, pursuant to Rule 402, M.R.Evid., the District Court should have excluded "the results of the toxicology report and evidence of Havens' alcohol consumption . . . because, in the absence of testimony linking the evidence to the question of causation, it was irrelevant." *Havens*, 54 St. Rep. at 1110, 945 P.2d at 944.

¶42 Similarly, in the present case, whether drug evidence was, in fact, relevant depended upon the State's ability at trial to demonstrate a link between that evidence and the cause of the accident. At trial, forensic toxicologist James Hutchison testified as an expert on behalf of the State as to the various chemical substances detected in Ingraham's blood and urine samples and their pharmacological effects. Hutchison explained that Ingraham's first blood sample, drawn at 4:12 a.m. on the morning of the accident, tested positive for subtherapeutic levels of librium, or chlordiazepoxide, a prescription drug often used to control anxiety. Although Hutchison testified that librium, when present in its therapeutic range, may "have some hypnotic sedative effects," he explained that the .27 milligrams per liter detected in Ingraham's blood was "well below therapeutic range." Hutchison testified that librium present at such a level would have "had no pharmacological effect" upon Ingraham on the evening of the accident, even in light of Ingraham's alcohol consumption. Hutchison noted that Ingraham's 4:12 a.m. blood sample also contained traces of librium's metabolite, nordiazepam, which he similarly agreed had no effect whatsoever upon Ingraham's ability to safely operate a motor vehicle on the night of the accident. The record indicates Ingraham's blood also tested positive for the presence of caffeine, which Hutchison again conceded had no pharmacological effect on Ingraham's ability to drive on the night of the accident.

¶43 Hutchison additionally testified that a second blood sample, drawn from Ingraham at 5:30 a.m., tested positive for the presence of lithium, a prescription drug used to control manic depression. Hutchison explained that the .82 millimoles per liter of lithium present in Ingraham's blood was within the drug's narrow therapeutic index, and stated that, even in combination with alcohol, that amount would have had no adverse effect upon Ingraham's ability to drive.

¶44 Hutchison further testified that Ingraham's urine sample, submitted with the blood drawn at 5:30 a.m., tested positive for the presence of nicotine, and its metabolite, cotinine. During cross-examination, Hutchison agreed that neither the nicotine nor its metabolite had any effect upon Ingraham's ability to operate a motor vehicle safely on the night of the accident. In fact, Hutchison explained that "[t]he fact we found these in urine, by itself, implies that there was no impairment, because the urine's just a reservoir for the drugs after they've cleared from the body." Also detected in Ingraham's urine, according to Hutchison, were traces of ephedrine and phenylpropanolamine, two drugs typically used as decongestants and commonly found in over-the-counter cold medications. Again, Hutchison agreed that neither of these drugs had any effect upon Ingraham's ability to drive on the evening of the accident.

¶45 With respect to the prescription bottle of Buspar located in Ingraham's car on the evening of the accident, it was Hutchison's undisputed testimony at trial that, to his knowledge, no Buspar was found in any of the blood or urine samples submitted for testing. Thus, although Ingraham had a bottle of Buspar in his car, the State presented no evidence at trial to indicate that any traces of the drug were present in his system.

¶46 Uncontradicted evidence presented to the jury established that none of the drugs detected in Ingraham's system, or found in his car, had any impairing effect whatsoever upon his ability to drive on the evening of the accident. As the State failed to demonstrate that any of the drugs detected in his blood and urine, or found in his car, were causally connected to the accident, we conclude that evidence of their presence was irrelevant to the question of Ingraham's negligence, or negligent state of mind, and was inadmissible on that basis. Accordingly, we conclude the District Court abused its discretion in denying Ingraham's motion in limine, and hold the court should have excluded all evidence of the librium, nordiazepam, caffeine, lithium, nicotine, cotinine, ephedrine, and phenylpropanolamine, found in Ingraham's system. We similarly hold the court abused its discretion when it denied Ingraham's motion to exclude evidence of the bottles of lithium and Buspar found by Officer Roth in Ingraham's car.

C. Prejudicial Effect

¶47 We have recognized that "[e]vidence of the use of drugs is, by its very nature,

prejudicial." *Simonson v. White* (1986), 220 Mont. 14, 23, 713 P.2d 983, 988. In *Simonson*, a civil negligence action arising from a fatal automobile accident, certain parties sought to exclude evidence that the driver had smoked marijuana, used cocaine, and ingested one or two capsules of Ephredine Sulphate on the day of the accident. *Simonson*, 220 Mont. at 23, 713 P.2d at 988. The district court granted the joint motion in limine pending the opposition's ability to establish a foundation demonstrating that, "[a]t the time of the collision, the driver was under the influence of drugs, and the passengers knew or should have known that he was under the influence," and that "[t]he driver's negligence was the proximate or controlling cause of the injuries to plaintiffs." *Simonson*, 220 Mont. at 23, 713 P.2d at 988. On appeal, we approved the district court's "demand for a [causal] link between the prejudicial evidence and the accident" and held that, in weighing "the probative value of the evidence against its prejudicial effect," the appropriate test was "whether [the driver's] drug usage 'more likely than not' affected his ability to drive." *Simonson*, 220 Mont. at 23-24, 713 P.2d at 988-89. Similarly, in *Havens*, we recognized that evidence that the driver had consumed alcohol on the day of the accident and had tested positive for the presence of marijuana, was of a "highly prejudicial nature" and "created a danger of confusion on the issue of causation." *Havens*, 54 St. Rep. at 1110, 945 P.2d at 944.

¶48 Likewise, in the present case, evidence that Ingraham tested positive for the presence of a variety of chemical substances, including librium and lithium, was of a highly prejudicial nature. The State failed to demonstrate at trial that it was more likely than not that Ingraham's use of the various drugs detected in his system or those found in his car in any way affected his ability to drive on the evening of the accident. Thus, as we held above, evidence that he had ingested various medications was in fact irrelevant to the question of Ingraham's negligent state of mind, and had virtually no probative value whatsoever.

¶49 Even if, as the State suggests, evidence of the drugs was relevant to show a negligent state of mind, its probative value in that regard would have been substantially outweighed by its prejudicial nature and the evidence should have been excluded. Evidence that Ingraham tested positive for the chemical substances of librium, nordiazepam, lithium, ephedrine, and phenylpropanolamine is by itself prejudicial. That these drugs are not illegal is of little ultimate consequence. Coupled with testimony regarding the potential effects of the various drugs, and in light of the fact that none of these substances had any effect whatsoever on his ability to drive on

the evening of the accident, evidence of their presence in Ingraham's system and in his car on the evening of the accident was unduly prejudicial. For example, although blood tests revealed only subtherapeutic levels of librium in Ingraham's system, Hutchison testified as to the drug's effects when present in higher, therapeutic doses. More specifically, Hutchison stated that, when present at a therapeutic level, librium may "have some hypnotic sedative effects." Despite the fact that none of the drugs, even in combination with the alcohol in Ingraham's system, had any effect on his ability to drive, Hutchison was permitted to testify that it would not be advisable "to mix these drugs and alcohol and driving." Such testimony was not only irrelevant, but was extremely misleading.

¶50 We have held that, if prejudice is alleged in a criminal case, "it will not be presumed but must be established from the record that a substantial right was denied." *State v. Stuit* (1996), 277 Mont. 227, 232, 921 P.2d 866, 869 (quoting *State v. Wells* (1983), 202 Mont. 337, 349, 658 P.2d 381, 388). We have held that "[t]he test of prejudicial error is whether 'beyond a reasonable doubt the error did not affect the outcome of the trial.'" *Stuit*, 277 Mont. at 232, 921 P.2d at 869-70 (quoting *State v. Alexander* (1994), 265 Mont. 192, 198, 875 P.2d 345, 349).

¶51 In the present case, we cannot say, beyond a reasonable doubt, that the District Court's error in admitting evidence of the drugs did not affect the outcome of Ingraham's trial. We accordingly conclude admission of the drug evidence in this case constituted prejudicial error.

ISSUE 2

¶52 Did the District Court err in admitting evidence of warnings generally given with the various medications detected in Ingraham's system and found in his car?

¶53 Our analysis of this issue is, of course, related to our analysis in Issue 1. In his pretrial motion in limine, Ingraham asked the court to issue an order precluding the State "from referring to interactions or warnings about interactions between alcohol and other drugs 'prescribed or recommended' to the defendant or found in his car." Ingraham suggested that "[r]eferences to or implications of such interactions would be unduly prejudicial, confuse the issues, mislead the jury, and appeal solely to the jury's passion and prejudice." As it did with respect to Ingraham's motion to generally exclude evidence of the drugs detected in his system and found in his car,

the District Court denied Ingraham's motion to exclude evidence of warnings about drug and alcohol interactions, concluding that evidence was relevant to the question of Ingraham's alleged negligence.

¶54 At trial, Ingraham objected to the proposed testimony of Michael Freeman, a pharmacist from the Family Health Pharmacy in Ronan. Ingraham opposed Freeman's plans to testify about warnings he had "given either to Mr. Ingraham directly or to patients generally about the dangers of librium and its use, either in conjunction with alcohol or with other prescription or nonprescription medicines." Ingraham sought to exclude the proposed testimony on several grounds. Ingraham first argued the proposed testimony was irrelevant in light of Hutchison's anticipated testimony that none of the drugs, either alone or in combination with alcohol, had any impairing effect upon Ingraham's ability to drive on the evening of the accident. Ingraham additionally argued that, even if relevant, the prejudicial effect of admitting evidence of warnings generally given in connection with the various medications in this case would "far exceed[] its probative value." In response, the State argued that the drugs detected in Ingraham's system and found in his car would be relevant to demonstrate Ingraham's negligence and that evidence of warnings generally given was relevant to demonstrate Ingraham's "gross negligence . . . in choosing to self-medicate with prescription drugs."

¶55 The District Court overruled Ingraham's objection to Freeman's proposed testimony. The court again reasoned that the question of whether Ingraham's use of the drugs, in conjunction with alcohol, "constitutes or is a component of gross negligence, is a fact question for the jury to decide," and concluded that evidence regarding warnings "is part of the evidence [the jury] need[s] to make that determination."

A. Relevance

¶56 As we have with respect to the admissibility of evidence regarding Ingraham's drug use, we similarly conclude that whether evidence of warnings generally given with those medications is relevant, and thus admissible, depends upon the State's ability to demonstrate a link between Ingraham's alleged failure to abide by those warnings and the cause of the accident.

¶57 At trial, pharmacist Freeman testified as to warnings generally given with the

medications at issue. Freeman was employed by the Family Health Pharmacy in Ronan, the pharmacy which dispensed the prescription bottle of Buspar found by Officer Roth in Ingraham's car. Freeman began his testimony by explaining his general duties as a pharmacist. For example, Freeman agreed that providing patients with information regarding "warnings or cautions about drug interactions" is "one of [his] main functions," and proceeded to detail the various methods he generally employs to impart that information. Freeman then testified that he had provided Ingraham with medications in the past, including the prescription bottle of Buspar. Freeman then read aloud from the auxiliary label affixed to the bottle of Buspar which cautioned patients to "[o]btain medical advice before taking nonprescription drugs which may affect the effect of this medication." Then, despite the fact that absolutely no traces of Buspar were present in Ingraham's system on the night of the accident, Freeman explained Buspar's use and general effects, recognizing that although "most patients can take [Buspar] without problem . . . pharmaceutical science is not an exact science."

¶58 The State then elicited testimony from Freeman regarding those warnings which, pursuant to "the generally-accepted practice in the field of pharmacy . . . would accompany the prescription of lithium." Freeman explained that in dispensing lithium, present at therapeutic levels in Ingraham's blood on the night of the accident, he

> would check a patient's profile, see if there's any medications they're already taking that might interact and give warning to that effect. Medications that would cause sedation or drowsiness, you would want to tell the patient that mixing that with lithium can cause further drowsiness. Any preparation containing alcohol can augment the drowsiness. Any medication such as a diuretic which will alter blood chemistry can augment the electrolyte imbalance that lithium can cause, and the patient would have to be warned about that too.

¶59 Freeman then examined the bottle of lithium, noting that it bore no prescription label. Moreover, Freeman testified that Ingraham had no active prescription for lithium with the Family Health Pharmacy as of the October 13, 1995, date of the accident.

¶60 The State then asked that Freeman describe those warnings which would

accompany the dispensing of librium, pursuant to the general practice in the field of pharmacy. Although the record indicates that the subtherapeutic levels of librium detected in Ingraham's system on the night of the accident had no pharmacological effect upon him, Freeman nevertheless explained that, "the very least you would do" is include a label warning that the drug "may cause drowsiness" and that "[m]ixing alcohol with that augments the drowsiness."

¶61 As discussed at length above, the State has failed to demonstrate a causal connection between Ingraham's drug use and the accident. By virtue of that fact, it is correspondingly apparent from a review of the record that the State has similarly failed to demonstrate a link between Ingraham's alleged failure to abide by those warnings and the cause of the accident. Although Freeman's testimony establishes that Ingraham, in all likelihood, received warnings which would have accompanied Buspar, no Buspar was found in his system. Thus, whether Ingraham received those warnings, and whether he complied with them, is not relevant and is, accordingly, inadmissible.

B. Prejudicial Effect

¶62 We agree with Ingraham's assertion that Freeman's testimony regarding warnings generally given was not only unduly prejudicial, but also served to obscure the fact that those medications had no impairing effect upon Ingraham's ability to drive, and played no causal role in the accident. For example, although the subtherapeutic levels of librium detected in Ingraham's system had no pharmacological effect upon Ingraham, Freeman nevertheless testified that librium may cause drowsiness, particularly in combination with alcohol. Despite the fact that the therapeutic level of lithium present in Ingraham's system had no impairing effect upon his ability to drive, Freeman explained that that drug too, would cause drowsiness, particularly in combination with alcohol. We conclude that such testimony was not only irrelevant, but was also unduly prejudicial. In light of the evidence presented, the jury may well have believed that the drugs, combined with alcohol, caused Ingraham to fall asleep at the wheel. Yet, the record indicates there exists no scientific basis for such a conclusion. Accordingly, we hold the District Court abused its discretion in admitting evidence of warnings which generally accompany such prescription medications as Buspar, lithium, and librium.

¶63 We cannot here conclude that, beyond a reasonable doubt, the District Court's

erroneous admission of evidence of warnings generally given, did not affect the outcome of the trial. We accordingly conclude admission of that evidence constituted prejudicial error.

ISSUE 3

**¶64 Did the District Court err in instructing the jury regarding the definition of "knowingly"?**

**¶65 Among the charges leveled against Ingraham in the present case was one count of criminal endangerment, in violation of § 45-5-207(1), MCA. Pursuant to § 45-5-207 (1), MCA, "[a] person who knowingly engages in conduct that creates a substantial risk of death or serious bodily injury to another commits the offense of criminal endangerment." At the close of trial, Ingraham objected to Instruction No. 19, which defined "knowingly" as follows:**

A person acts knowingly:

 (1) when he is aware of his conduct or

(2) when he is aware under the circumstances that his conduct constitutes a crime or

 (3) with respect to a specific fact, when he is aware of a high probability of that fact's existence.

**¶66 Ingraham specifically took issue with the provisions of subsection (1), pursuant to which the jury could determine that Ingraham acted knowingly if "he [was] aware of his conduct." The court effectively overruled Ingraham's objections, and issued Instruction No. 19 as set forth above. The jury returned its verdict, convicting Ingraham of the offense of felony criminal endangerment.**

**¶67 On appeal, Ingraham asserts the court incorrectly interpreted the law and erroneously instructed the jury regarding the appropriate definition of "knowingly." Ingraham argues "Instruction No. 19 was erroneous because it permitted the jury to convict Mr. Ingraham without finding that he was aware of 'the high probability' that his conduct would cause a substantial risk of death or serious bodily injury." In**

support of his argument on this point, Ingraham relies on our recent decision in *State v. Lambert* (1996), 280 Mont. 231, 929 P.2d 846, in which we held the court's decision to issue a similar instruction constituted reversible error.

¶68 In *Lambert*, decided by this Court five months after Ingraham's trial, the defendant was charged with criminal endangerment, pursuant to § 45-2-207(1), MCA, as well as with a number of other offenses. *Lambert*, 280 Mont. at 233, 929 P.2d at 847. The court instructed the jury that:

A person acts knowingly:

(1) *when he is aware of his conduct* or

 (2) when he is aware under the circumstances that his conduct constitutes a crime or

 (3) when he is aware there exists the high probability that his conduct will cause a specific result.

 *Lambert*, 280 Mont. at 234, 929 P.2d at 848.

¶69 We held the court specifically erred in instructing the jury that a person charged with criminal endangerment acts knowingly "when he is aware of his conduct," instead concluding "that the 'knowingly' element of criminal endangerment contemplates a defendant's awareness of the high probability that the conduct in which he is engaging, whatever that conduct may be, will cause a substantial risk of death or serious bodily injury to another." *Lambert*, 280 Mont. at 237, 929 P.2d at 850. In so concluding, we recognized that "[i]t is the appreciation of the probable risks to others posed by one's conduct that creates culpability for criminal endangerment," rather than the "mere appreciation of one's conduct." *Lambert*, 280 Mont. at 236, 929 P.2d at 849.

¶70 In the present case, we have already concluded that Ingraham is entitled to a new trial on the grounds that the court committed reversible error in admitting the drug evidence. In light of our determination that Ingraham is entitled to a new trial on the charges of negligent homicide and criminal endangerment on those grounds,

we simply advise that, on retrial, the District Court should comply with our holding in *Lambert* when instructing the jury as to the definition of "knowingly."

ISSUE 4

**¶71 Are convictions for negligent homicide and criminal endangerment legally inconsistent?**

**¶72 Ingraham argues that his felony convictions for negligent homicide and criminal endangerment are legally inconsistent because "[t]he jury was permitted to conclude that the same conduct -- crossing the center line -- constituted both a negligent act and, inconsistently, a knowing act." More specifically, Ingraham argues that, with respect to the charge of criminal endangerment, the District Court improperly instructed the jury as to the definition of "knowingly," because it did not require the jury to "find that Mr. Ingraham acted with awareness of a high probability that a particular result would occur." Because the court did not require that the State demonstrate Ingraham acted "with awareness of the consequences of his acts," Ingraham argues, "the common element between the states of mind required for the" offenses of negligent homicide and criminal endangerment was missing.**

**¶73 In response, the State first asserts that Ingraham has failed to cite to adequate authority in support of his argument on this issue, and that this Court should decline to address it. The State also argues Ingraham failed to present this issue to the District Court, and he is thus precluded from raising it on appeal. Even if properly raised on appeal, however, the State next asserts that this Court has previously rejected the same argument in the case of *State v. Pierce* (1982), 199 Mont. 57, 64-65, 647 P.2d 847, 851, *overruled on other grounds by State v. Tadewaldt* (1996), 277 Mont. 261, 922 P.2d 463. In *State v. Pierce,* we recognized that**

[t]he mental state required to satisfy "knowledge" is more culpable than that for "criminal negligence" because the actor must know it probable that a result will follow. "Criminal negligence" can be shown if risk to others is disregarded. However, proof of knowledge necessarily proves the elements of criminal negligence. You cannot engage in conduct knowing it likely will harm others without, at the same time, disregarding the risk to those others. The mental states are therefore not mutually exclusive.

*Pierce*, 199 Mont. at 65, 647 P.2d at 851.

¶74 Ingraham concedes that, had the District Court properly instructed the jury pursuant to *Lambert*, "then the State's argument that proof of knowledge also establishes proof of negligence under *State v. Pierce* (1982), 199 Mont. 57, 647 P.2d 347, would be correct." Ingraham asserts, however, that because "the jury was not required to find that Mr. Ingraham acted with awareness of a high probability that a particular result would occur . . . the common element between the states of mind required for the two offenses -- awareness of risk -- was missing."

¶75 As discussed above, we have instructed the District Court, on retrial, to comply with our holding in *Lambert* in instructing the jury on the definition of "knowingly" as an element of criminal endangerment. In so doing, we have effectively mooted Ingraham's argument that convictions for negligent homicide and criminal endangerment are legally inconsistent.

## ISSUE 5

¶76 Is there sufficient evidence of record to support Ingraham's conviction for criminal endangerment?

¶77 On appeal, Ingraham argues the State failed to present sufficient evidence at trial upon which the jury could premise its verdict that Ingraham committed the crime of criminal endangerment. More specifically, Ingraham asserts the evidence was insufficient to show Ingraham "knowingly" engaged in conduct that created a substantial risk to Adams, the injured occupant of the vehicle. Ingraham also argues the State's evidence failed to demonstrate beyond a reasonable doubt that he "knowingly" failed to render aid to Adams.

¶78 Having already held that Ingraham is entitled to a new trial on the charge of criminal endangerment on other grounds, we need not address Ingraham's argument that the record contains insufficient evidence to support his conviction for criminal endangerment.

## ISSUE 6

¶79 Is there sufficient evidence of record to support Ingraham's conviction for negligent homicide?

¶80 Ingraham additionally argues there exists insufficient evidence of record to support the jury's verdict of guilty on the charge of negligent homicide. In light of our holding that Ingraham is entitled to a new trial on the charge of negligent homicide on other grounds, we need not address Ingraham's argument that the record contains insufficient evidence to support his conviction.

ISSUE 7

¶81 Did the District Court err in admitting evidence of a second blood alcohol test, the results of which were contained in Ingraham's medical records?

¶82 On October 17, 1995, the State completed an application for an investigative subpoena "to obtain blood samples taken from Greg Ingraham at St. Luke Hospital, Ronan, Montana, on or about October 13, 1995, as well as any medical records pertaining to Ingraham's treatment during that time period." In its application, the State revealed that because the blood sample already in its possession had been preserved with a sodium-based preservative, technicians at the Montana State Crime Lab would be unable to test it for the presence of lithium and Buspar. The State thus sought Ingraham's medical records, alleging in its application for an investigative subpoena that:

From previous experience with similar cases I am aware that hospitals routinely perform their own alcohol and drug tests on patients to determine whether those patients are under the influence of any substances which could affect their treatment. Hospital records also reflect statements made by the patient to hospital employees. Both of these items are relevant to the prosecution of this case.

¶83 The District Court issued the investigative subpoena on October 17, 1995, concluding that the "application has been made in good faith and in the furtherance of a pending criminal investigation," and that "there is reason to believe that the aforesaid test results may constitute evidence of possible criminal activities."

¶84 On February 20, 1996, Ingraham filed a motion to limit the scope of the

investigative subpoena, and to preclude the State from using any records "thus obtained from St. Luke's Hospital." Ingraham argued the subpoena was overly broad, and in violation of §§ 46-4-301 and -303, MCA. In a June 14, 1996, order, the District Court denied Ingraham's motion on the grounds that it was "unable to conclude . . . that [Ingraham's] privacy interest in statements made to hospital employees at or near the time of the accident outweighs the public's right to know."

¶85 On June 21, 1996, Ingraham filed a motion in limine seeking to specifically "exclude all evidence of the blood alcohol test performed at St. Luke's Hospital at 5:30 a.m., October 13, 199[5]." The court denied Ingraham's motion in limine, noting in part that "the State was charged with the responsibility of determining if there was probable cause to believe a crime had been committed." The court concluded the State had "a clear compelling need for any evidence tending to establish [Ingraham's] blood alcohol content near the time of the accident." Moreover, the court reasoned that simply because "the State had access to the 4:12 test does not mitigate its need for any additional tests performed in the general time period following the collision," and held that Ingraham's "privacy interest in the blood alcohol test is outweighed by the State's compelling need to establish the facts as to the collision."

¶86 Ingraham argues on appeal that the District Court abused its discretion in denying his motion to exclude evidence of test results from the 5:30 a.m. blood sample. More specifically, Ingraham asserts the court erred in concluding the State demonstrated that its compelling need for those test results outweighed any expectation of privacy he had in his own medical records, and in concluding the State had demonstrated it had probable cause to justify the court's issuance of the investigative subpoena.

¶87 In *State v. Nelson* (1997), 283 Mont. 231, 941 P.2d 441, decided by this Court roughly one year after Ingraham's trial, we had occasion to redefine the standard pursuant to which the State may obtain discovery of protected medical records. In *Nelson*, we held

that in order to establish that there is a compelling state interest for the issuance of an investigative subpoena for the discovery of medical records, the State must show probable cause to believe that an offense has been committed and medical information relative to the commission of that offense is in the possession of the person or institution to whom the

subpoena is directed.

*Nelson*, 283 Mont. at 244, 941 P.2d at 449.

¶88 In *Nelson*, we held the State had probable cause to believe an offense had been committed and that the defendant's medical records contained evidence of the offense, where the facts indicated "that Nelson had consumed a couple of drinks before the accident; that the road was bare and dry; that he ran into a guardrail; that he suffered a broken jaw; and that he had received medical treatment at the Glendive Medical Center." *Nelson*, 283 Mont. at 244, 941 P.2d at 450. Under the facts in that case, we affirmed the District Court's order denying Nelson's motion to quash the investigative subpoena, or in the alternative to suppress evidence. *Nelson*, 283 Mont. at 244, 941 P.2d at 450.

¶89 In the present case, the State's application for an investigative subpoena set forth facts which demonstrate it had probable cause to believe an offense had been committed and that Ingraham's medical records contained evidence of the offense. In its application, the State asserted that Ingraham's vehicle "had crossed over the centerline and struck a pickup truck," and indicated that "[w]itnesses at the scene said that Ingraham appeared to be intoxicated, and the officers found a beer bottle and several beer bottle caps in Ingraham's car." The State also noted that "two prescription medicine bottles" were found in his car. Moreover, it is apparent from the text of its application that the State was aware that Ingraham had received treatment at St. Luke Hospital in the hours following the accident. Applying the standard enunciated by this Court in *Nelson*, we conclude the State adequately demonstrated it had a compelling state interest for the issuance of an investigative subpoena. We accordingly affirm the District Court's orders denying Ingraham's motion to limit the scope of the investigative subpoena, and denying his motion to exclude evidence of test results from the 5:30 a.m. blood sample.

## ISSUE 8

¶90 Did the District Court err in excluding a demonstrative videotape from evidence?

¶91 On appeal, Ingraham argues the District Court abused its discretion in excluding from evidence a demonstrative video prepared by a defense expert to illustrate Ingraham's theory as to how the accident occurred. Defense expert and accident

reconstructionist Dr. Floyd Denman Lee, prepared the videotape to demonstrate that the collision could have occurred had Ingraham swerved to the left in an attempt to avoid Harriman-Larson's vehicle which he alleges was approaching in his lane of traffic.

¶92 After viewing the videotape, hearing argument by the parties, and listening to foundational testimony by Dr. Lee, the court ordered the demonstrative videotape excluded from evidence. The court explained its decision to exclude the videotape as follows:

I am not going to allow a video that focuses on one of a minimum six, maximum of 25, equally-probable solutions to be thrust upon the State at the last minute. I find that this particular video is, in fact, with regard to the distance of the vehicles, not even based upon the testimony of any of the witnesses. I think it unduly emphasizes one of several equally probable scenarios in this case.

I certainly think this witness is as free as a bird to testify about those. But to allow this sort of visual display of one of them to the exclusion of the others, I think, means that its probative value is outweighed by its prejudicial effect.

As well, I'm concerned about the fact that this is based upon statements of witnesses and not testimony of witnesses, and there are certainly credibility calls for the jury to make with regard to those differences. So I'm not going to allow it.

¶93 We review the District Court's evidentiary ruling for an abuse of discretion. *State v. Oatman* (1996), 275 Mont. 139, 144, 911 P.2d 213, 216.

¶94 We have held that "[e]xhibits used for demonstration purposes are admissible if they supplement the witness's spoken description of the transpired event, clarify some issue in the case, and are more probative than prejudicial." *Palmer by Diacon v. Farmers Ins. Exchange* (1988), 233 Mont. 515, 522-23, 761 P.2d 401, 406 (citing *Workman v. McIntyre Construction Co.* (1980), 190 Mont. 5, 24, 617 P.2d 1281, 1291). Moreover, "movies of reconstructions . . . are admissible if shown to be accurate and relevant, and any change in conditions is adequately explained." *Brown v. North Am. Mfg. Co.* (1978), 176 Mont. 98, 117, 576 P.2d 711, 722.

¶95 Thus, in determining whether to permit the introduction of demonstrative

evidence, the court should consider a number of factors, including whether the evidence would supplement a witness's description of events and clarify some issue in the case. *Palmer*, 233 Mont. at 522-23, 761 P.2d at 406. Furthermore, the court should consider whether the evidence is both accurate and relevant, whether any change in conditions has been adequately explained, and whether the prejudicial effect of the evidence outweighs its probative value. *Palmer*, 233 Mont. at 522-23, 761 P.2d at 406; *Brown*, 176 Mont. at 117, 576 P.2d at 722.

¶96 Despite Ingraham's assertions to the contrary, review of the record indicates that the court did indeed consider whether the prejudicial effect of the videotape outweighed its probative value, and expressed concern over admitting a videotape which had been thrust upon the State at the last minute.

¶97 Although the court considered some of the requisite factors, it did not consider all of the factors set forth in our decisions. In light of the fact that we are, in any event, remanding the case for retrial on other grounds, we advise the court to specifically address the factors discussed in *Workman*, *Palmer*, and *Brown* and reconsider the question of whether the videotape may be admissible as demonstrative evidence.

ISSUE 9

¶98 Did the District Court err in admitting expert testimony regarding blood alcohol levels?

¶99 Ingraham argues the District Court erred in permitting State forensic scientist Lynn Kurtz to testify on rebuttal as to the number of drinks Ingraham would have had to consume to reach the BACs later tested, and as to Ingraham's specific BAC level at the time of the accident. Ingraham argues that because Kurtz acknowledged during the State's case-in-chief that he could not specifically determine Ingraham's BAC at the time of the accident, the court erred in permitting him to do "exactly what he . . . had agreed could not be done," and testify during rebuttal as to Ingraham's specific BAC at the time of the accident. More specifically, Ingraham argues the court "erred in permitting Mr. Kurtz to speculate that defendant's blood alcohol level, tested at .07 at 4:12 a.m., was higher than .10 at the time of the accident," and asserts Kurtz's opinion was dependent upon a number of unspecific factors and unsupported by his earlier testimony.

¶100 The State, in response, notes that Kurtz agreed on direct examination that he could not estimate Ingraham's BAC at the time of the accident without certain additional information. Once it had succeeded in getting the missing information into the record, the State asserts, Kurtz was then entitled to rely on a shortened version of the Widmark formula to estimate what Ingraham's BAC would have been at the time of the accident, were he to have consumed the number of drinks to which he testified. The State additionally argues Kurtz was entitled to estimate that Ingraham would have had to consume sixteen Bud Lights to reach the BAC of .07 indicated by the 4:12 a.m. blood test.

¶101 We review a district court's evidentiary ruling for an abuse of discretion. *State v. Gollehon* (1993), 262 Mont. 293, 301, 864 P.2d 1257, 1263.

¶102 During the State's case-in-chief, Kurtz indeed agreed that he did not know what Ingraham's BAC was at the time of the accident. As illustrated by the following exchange on redirect, however, Kurtz testified that, were there additional facts in the record, he could more accurately estimate what Ingraham's BAC might have been at the time of the accident:

Q (County Attorney): And the same thing with the Defendant having a .077 BAC at the time he's tested at 4:12. We don't know where he was, based upon the information that we have right now at the time of the wreck; isn't that correct?

A (Kurtz): That's also correct.

Q: Now, if we had the information concerning what he had in his stomach, the number of drinks that he alleges he had, the types of drinks he alleges he had, you stated that you can make some assumption concerning body water content, during direct examination, food type, food quality. [If t]hat information was provided to us and put into evidence, do you think that you can make an educated guess, within a reasonable degree of scientific certainty or probability, as to what his BAC could have been at the time of the wreck?

A: I could more fully demonstrate the potential BACs at the time of the incident, given that extra information.

Q: Which is not in the record as of yet, to your knowledge.

**A: To my knowledge, no.**

**¶103 Following Kurtz's initial testimony, much of the information upon which Kurtz explained an estimate of Ingraham's BAC at the time of the accident depended, entered the record. For example, Ingraham testified as to the number and type of alcoholic beverages he consumed in the hours preceding the accident, and described the food he consumed over the course of the evening. Moreover, he agreed that the weight reflected on his driver's license might be accurate at 170 pounds.**

**¶104 Although Ingraham argues it was error for the court to permit Kurtz to testify that Ingraham's BAC was greater than .10 at the time of the accident, a close review of Kurtz's testimony on rebuttal indicates he actually made no such statement. The transcript indicates that the State, on rebuttal, asked Kurtz to assume that Ingraham's eating and drinking history on the night of the accident was as reflected in his testimony. The State additionally asked Kurtz to assume Ingraham weighed 170 pounds. In response to the State's hypothetical question, Kurtz stated he would have expected to see a BAC of only .018 at 4:15 a.m. Kurtz also testified that, for Ingraham's BAC to reach .077 by 4:12 a.m., he would have had to consume "approximately 16 drinks."**

**¶105 Review of the transcript indicates that, by the time the defense rested, the record contained evidence of those factors identified by Kurtz as necessary in order for him to estimate the number of drinks Ingraham would have had to consume to reach a BAC of .077 by 4:12 a.m., and to estimate Ingraham's BAC at the time of the accident. Although Ingraham takes issue with the shorthand version of the Widmark formula upon which Kurtz relied while testifying, the record indicates that a number of professionals in Kurtz's field rely upon the same formula. Moreover, we note that Kurtz offered an in-depth explanation of his formula for the jury's consideration, and that Ingraham's counsel extensively cross-examined Kurtz on his shortened formula. Based on the foregoing, and having reviewed the record, we conclude the District Court did not abuse its discretion in permitting Kurtz to estimate the number of drinks that Ingraham would have had to consume on the night of the accident and to estimate Ingraham's BAC level at the time of the accident.**

## ISSUE 10

**¶106 Did the District Court err in admitting testimony by paralegal Jeanne**

Windham?

¶107 Ingraham argues the District Court erred in permitting paralegal Jeanne Windham to testify as to statements Ingraham made to her about the accident. Ingraham asserts that Windham was one of his law firm's employees, and argues the content of his conversations with her about the accident was protected by the attorney-client privilege and constituted privileged work product. Moreover, Ingraham asserts the court erred in admitting rebuttal testimony regarding additional conversations overheard by Windham, but which did not tend to counteract new matter introduced by the defense.

¶108 The State, in contrast, argues that neither the attorney-client privilege nor the work product rule apply to protect the content of conversations between Ingraham and Windham in the aftermath of the accident. The State additionally asserts that Windham's testimony on rebuttal was proper, and urges the court did not err in overruling Ingraham's objections to its admission.

¶109 We review the District Court's evidentiary ruling for an abuse of discretion. *State v. Gollehon* (1993), 262 Mont. 293, 301, 864 P.2d 1257, 1263.

## A. Attorney-client privilege

¶110 Ingraham first asserts the content of his conversations with Windham was protected by the attorney-client privilege, and that the District Court thus erred in overruling his objections to Windham's proposed testimony. Ingraham argues that, upon making the telephone call to his father on the night of the accident, he became a client of the Ingraham Law Office. Ingraham asserts that, because Windham worked as a paralegal for the Ingraham Law Office at the time of the accident, the attorney-client privilege extends to her and protects any statements he made to her regarding the accident.

¶111 In support of his argument, Ingraham points to § 26-1-803(1), MCA, pursuant to which "[a]n attorney cannot, without the consent of his client, be examined as to any communication made by the client to him or his advice given to the client in the course of professional employment." Ingraham asserts his disclosures to Windham were made "in the course of professional employment," and thus fall within the protection afforded by the attorney-client privilege.

¶112 Over Ingraham's objection, the District Court permitted Windham to testify, concluding that it did not believe that the communication that took place between the Defendant and Ms. Windham on October 13th, 1995, . . . at approximately six o'clock p.m., can reasonably be construed as communication made by a client to the attorney, as the statute defines in the course of professional employment.

There are several factors that lead me to that conclusion. The first one is that there's no indication that Greg Ingraham had retained Ingraham Law Office as his counsel with regard to this accident. There certainly is no indication, even if that had happened, that Ms. Windham had any reason, whatsoever, to believe that that had happened. And I have no reason to believe that Greg Ingraham believed that that had happened.

Even if it had, Ms. Windham left her professional employment when she left that office at five o'clock that day, on her own volition, to visit the Defendant as a friend. The only reason she received communications from the Defendant that night is because she agreed, as a friend, to transport him to her house so that she could take care of him. And it's inconceivable to me that that can be construed to be in the course of professional employment. The Defendant then requested her, during that visit, to go to the accident scene, apparently, and said certain things to her. That doesn't necessarily become an attorney-client communication just because Ms. Windham happens to have been an independent contractor for the Defendant at that time. I think it's a factor that she wasn't paid for that time that she spent with him. . . . And so I don't believe that this could reasonably have been construed by the Defendant as a conversation by a client with an attorney or a member of his attorney's office. And so I'm going to deny the motion to exclude her testimony.

¶113 Windham testified in chambers that, although she worked for Gregory Ingraham as an independent contractor, she performed no paralegal services for Lloyd Ingraham. She also testified that she had done nothing to assist Gregory Ingraham in defending this case, and that to her knowledge, there was no file on this case at the Ingraham Law Firm. Our review of the pertinent testimony indicates that Ingraham's conservations with Windham were purely personal and not in the course of a professional relationship. Having reviewed the record, we conclude the District Court did not abuse its discretion in concluding that the content of Ingraham's conversations with Windham on the day of the accident were not protected by attorney-client privilege and in admitting her testimony.

## B. <u>Work-product</u>

¶114 On June 18, 1996, Ingraham filed a motion to dismiss all the charges brought against him on "grounds of violation of the attorney-client privilege and work product rule." The court denied Ingraham's motion, concluding in pertinent part that the work product doctrine did not apply to conversations Ingraham had with Windham in the aftermath of the accident. In so concluding, the court reasoned that

[t]he logical extension of this argument would be that no statements of attorney-parties to litigation would ever be admissible. There was never any indication that the Defendant was representing himself in connection with this matter. In fact, in support of his argument concerning the attorney-client privilege, Defendant contends that the relationship was established between himself, as client, and his father, as attorney, within minutes after the motor vehicle collision that led to these charges. There is no support for the proposition that the information shared by Defendant with his employees should be excluded under the work product doctrine.

Having reviewed the record, we agree with the District Court's conclusion on this issue and, absent an abuse of discretion, we will not disturb its decision to admit Windham's testimony. C. <u>Rebuttal testimony</u>

¶115 Finally, Ingraham argues Windham's testimony on rebuttal was improper. Ingraham notes that, on rebuttal, Windham testified as "to what she heard Mr. Ingraham say when he described the accident to other persons, when his father was not present." Ingraham asserts that, although the court agreed the testimony did not constitute proper rebuttal, it nevertheless allowed that testimony. For the court to do so, Ingraham argues, was an abuse of discretion.

¶116 Contrary to Ingraham's assertion, the court, in fact, concluded that Windham's testimony was appropriate rebuttal, even though it did not directly refute Ingraham's version of his conversation with Windham on the date of the collision. Having reviewed the record, we hold the District Court did not abuse its discretion in so concluding, and in allowing Windham's testimony on rebuttal.

## ISSUE 11

¶117 Did the District Court err in ordering the parties not to contact the jurors after

they rendered their verdict?

¶118 Ingraham's counsel asserts that, following the verdict in this case, he learned of the possibility "that the jury may have received extraneous prejudicial information, resulting from a highly prejudicial conversation in a juror's presence." On August 16, 1996, Ingraham filed a motion for a new trial, on the grounds of alleged juror misconduct. On October 9, 1996, the District Court ordered that counsel refrain from contacting the jurors in this case. Ingraham filed a second motion for a new trial on October 24, 1996, and additionally asked that the court lift its "order prohibiting counsel from speaking with trial jurors." On December 31, 1996, the District Court issued its findings of fact, conclusions of law, and order denying Ingraham's motions for a new trial. On appeal, Ingraham argues the court was without authority to "issue a blanket order precluding attempted contact with nonparty witnesses," and asserts the court's order that he not contact the jurors prevented a full investigation into allegations of juror misconduct.

¶119 In light of our determination that Ingraham is entitled to a new trial with respect to the charges of negligent homicide and criminal endangerment on other grounds, we need not reach the merits of this issue.

## ISSUE 12

¶120 Did the District Court commit prejudicial cumulative error, thereby entitling Ingraham to a new trial?

¶121 We need not address the question of whether Ingraham is entitled a new trial pursuant to the cumulative error doctrine in light of our conclusion that the District Court committed reversible error in admitting evidence of the medications detected in Ingraham's system and found in his car, and in admitting evidence of warnings generally given along with those medications.

## CONCLUSION

¶122 We hold the District Court erred in admitting evidence of medications detected in Ingraham's system and found in his car. We hold the District Court also erred in

admitting evidence of warnings generally given with the various medications.

¶123 We affirm the District Court's decision admitting expert testimony regarding blood alcohol levels and in admitting testimony by paralegal Jeanne Windham. We also affirm the District Court's orders denying Ingraham's motion to limit the scope of the investigative subpoena, and denying his motion to exclude evidence of test results from the 5:30 a.m. blood sample.

¶124 We need not address whether there exists sufficient evidence of record to support Ingraham's convictions for criminal endangerment and negligent homicide, and need not discuss the cumulative error doctrine. Moreover, we need not address the question of whether the court erred in ordering the parties not to contact the jurors after they rendered their verdict. Finally, we conclude that Ingraham's argument that convictions for negligent homicide and criminal endangerment are legally inconsistent is moot.

¶125 We advise the District Court, on retrial, to comply with our decision in Lambert in instructing the jury as to the definition of knowingly. Moreover, we advise the court to reconsider the question of whether the videotape is admissible as demonstrative evidence in light of the specific factors set forth in Palmer, Workman, and Brown.

¶126 Based on the foregoing, we vacate the judgment of the District Court and remand this case for retrial on charges of negligent homicide and criminal endangerment.

/S/ JIM REGNIER

We Concur:

/S/ JAMES C. NELSON

/S/ WILLIAM E. HUNT, SR.

/S/ W. WILLIAM LEAPHART

**Chief Justice J. A. Turnage and Justice Terry N. Trieweiler did not participate in this opinion.**

**Justice Karla M. Gray concurs and dissents.**

¶127 I concur in the Court's opinion on all issues except issue 8. On that issue, which is whether the District Court erred in excluding a demonstative videotape from evidence, I respectfully dissent.

¶128 My first concern is with the Court's decision to remand this issue for reconsideration under our cases involving the admissibility of demonstrative evidence. By failing to address and resolve this issue now, with a full record and an articulated decision by the District Court before us, the Court merely leaves an unresolved issue for potential appeal after retrial. This course strikes me as unwise, particularly in light of the fact that the Court has resolved all other issues on appeal--including issue 7, which could have been remanded for reconsideration in light of Nelson, which was decided after the present case had been tried. In my view, the Court took the wise approach in deciding issue 7--rather than remanding it--in order to avoid the possibility of leaving a potentially appealable issue for resolution after retrial. The Court should follow the same wise course on issue 8.

¶129 Moreover, I suspect that the Court's failure to resolve the issue, and its directive that the District Court reconsider its decision, may be a backhanded way of telling the District Court that it erred in this regard and should avoid doing so in the next trial. If it is the Court's decision that the trial court erred, it should say so. If not, it should say so. To leave the District Court in such a quandary seems inappropriate.

¶130 I would address issue 8 on the merits and affirm the District Court. The Court faults the trial court for failing to consider all of the factors set forth in Workman, Brown and Palmer. I would not. We have never held that those three cases, or any others, create a mandatory laundry list of factors to be considered to the exclusion of any others. Nor is the Court's list of relevant cases complete. If the Court desires the trial court to review each and every case addressing the admissibility of demonstrative evidence, and articulate its decision on each factor mentioned therein,

I suggest that it asks too much. If that is to be the trial court's burden, however, the Court should at least include in its list cases such as State v. Crazy Boy (1988), 232 Mont. 398, 757 P.2d 341, which concludes that the exclusion of cumulative demonstrative evidence does not constitute reversible error.

¶131 Furthermore, it is my view that the District Court sufficiently addressed the factors in Workman, Brown and Palmer, as well as several other factors appropriate to the circumstances here. In this regard, I observe that the Court has neglected to include the entirety of the District Court's rationale in excluding the videotape and, to set the record straight, I note that--in addition to the reasons set forth in the Court's opinion--the District Court also determined that the videotape would not assist the jury and, indeed, would mislead the jury by giving visual emphasis to only one of several equally probable scenarios.

¶132 In Workman, 190 Mont. at 24, 617 P.2d at 1291, we stated that the admissibility of demonstrative exhibits depends "on whether it would be helpful to permit the witness to supplement his [verbal] description by their use." Presumably our reference to "helpful" meant helpful to the jury. Here, the District Court determined in that regard that the videotape would not assist the jury, but would mislead it. We also concluded in Workman (190 Mont. at 24, 617 P.2d at 1291) that demonstrative evidence is inadmissible when it does not illustrate or make more clear some issue (that is, when the evidence is irrelevant or immaterial) or when the evidence is "of such a character as to prejudice the jury." Here, the District Court effectively determined that the videotape would prejudice the jury by overemphasizing one of a number of equally probable scenarios.

¶133 In Brown , 176 Mont. at 117, 576 P.2d at 722, we required that demonstrative movies be "accurate and relevant." Here, the District Court determined that the distance depicted on the videotape was not accurate in that it was not based on the testimony of any of the witnesses. The record reflects that the District Court was correct in so determining, because Dr. Lee used a 1/5 mile distance in the videotape and the witness' testimony was "less than ½ mile," while his interview statement--on which Dr. Lee relied--gave the distance as 1/4 to ½ mile.

¶134 In Palmer, 233 Mont. at 522-23, 761 P.2d at 406, we stated a 3-part test for the admissibility of demonstrative evidence: 1) the evidence must supplement the witness' spoken description of the transpired event; 2) it must clarify some issue in

the case; and 3) it must be more probative than prejudicial. It is true that, in this case, the District Court did not articulate precisely whether the first two parts of the Palmer test were met. The Court's suggestion to the contrary notwithstanding, however, all three parts of the Palmer test clearly need not be addressed if the trial court makes a determination under the third part that the demonstrative exhibit is, in fact, more prejudicial than probative. The Court correctly notes in this regard that the District Court did consider whether the prejudicial effect of the videotape outweighed its probative value and concluded that it did.

¶135 On this record, it is clear that the District Court properly considered and addressed the factors set forth in Workman, Brown and Palmer for admissibility of demonstrative evidence. In addition, the District Court could properly have determined--under Crazy Boy--that the videotape was merely cumulative to Dr. Lee's testimony about the one scenario depicted therein. Indeed, the court implicitly did so when it determined that to use the videotape to emphasize only one of the probable scenarios to which Dr. Lee testified would mislead the jury.

¶136 I would conclude that the District Court did not abuse its discretion in excluding the demonstrative videotape. Therefore, I dissent from the Court's opinion on issue 8.

/S/ KARLA M. GRAY

Justice James C. Nelson specially concurs.

¶137 I concur with and have signed the Court's opinion. I write separately only because I strongly disagree with Justice Gray's articulated suspicion that our failure to resolve Issue 8 and our directive to the trial court to reconsider its decision on this issue "is a backhanded way of telling the District Court that it erred." That was not my thinking when I voted for and signed the Court's decision and I do not believe that was the rationale of any of the other justices in the majority.

¶138 Obviously, the videotape was an important piece of evidence in Ingraham's presentation of his defense as far as he was concerned. Equally obvious, is that the State, considered the videotape damaging to its case. The point is, however, that Ingraham is entitled to have this evidence admitted on retrial if he can satisfy the Workman, Palmer and Brown criteria. If he cannot, then the State is entitled to keep

this evidence from the jury. My concern and that of the majority was and is simply that, whatever decision is made on retrial, the court's discretion must be exercised within the parameters of a full and complete consideration of the factors that this Court, in our prior decisions, has stated are controlling before the admission or rejection of this sort of evidence. In my view, our opinion should not be read as standing for anything more or less than that, nor should it be read as a backhanded reversal of the District Court.

¶139 Finally, if the dissent's concern is that resolving, rather than remanding, this issue will prevent a second appeal if Ingraham is again convicted, then I suggest that hope has triumphed over experience.

/S/ JAMES C. NELSON

Justice Jim Regnier concurs in the foregoing special concurrence.

/S/ JIM REGNIER